RBS



## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel.* CAF
PARTNERS and CAF PARTNERS
individually,

          **Plaintiffs,**

    v.

AMEDISYS, INC. and ERNST & YOUNG,
LLP,

          **Defendants.**

**CASE NO.: 10-cv-2323**

**FILED *IN CAMERA* UNDER SEAL**

**JURY TRIAL DEMANDED**

**FILED**

JUN – 6 2012



MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

## THIRD AMENDED COMPLAINT

## INTRODUCTORY STATEMENT

    Plaintiff-Relator CAF Partners ("Plaintiff" or "Relator"), by and through its undersigned

attorneys, KENNEY & McCAFFERTY, P.C., DURRELL LAW OFFICE and THOMAS &

ASSOCIATES, on behalf of the United States of America, alleges as follows for its Third

Amended Complaint against Amedisys, Inc. ("Amedisys") and Ernst & Young, LLP ("E&Y")

based upon personal knowledge and relevant documents:

    1.    This is an action brought on behalf of the United States of America by Plaintiff

against Defendants pursuant to the *Qui Tam* provisions of the Civil False Claims Act, 31 U.S.C.

§§ 3729-33 ( "FCA"), referred to herein as the "*Qui Tam* Action."

    2.    As a direct, proximate and foreseeable result of Defendants' fraudulent course of

conduct set forth herein, and conducted on a national scale, Amedisys knowingly submitted, and

Defendants caused to be submitted, thousands of false or fraudulent statements, records, and

claims to Medicare seeking reimbursement for health care services from at least 2003 through the present.

3.     The practices complained of herein are continuing. As detailed below, the Defendants' actions and omissions have caused many years of improper and false billings to the United States through the Medicare program.

4.     The Amedisys schemes that have resulted in false billings to Medicare that began in at least 2003, as alleged more specifically *infra*, include but are not limited to the following:

- upcoding patients' case mix data to artificially inflate the base Medicare reimbursement paid for home health services;

- artificially inflating the home health therapy services rendered to patients to qualify for high therapy adjustment bonus payments;

- offering and/or paying illegal remuneration, both in cash and in kind, to physicians and hospitals with the intent to induce patient referrals in return; and,

- fraudulent and false patient recertifications.

5.     Further, Defendants Amedisys and E&Y conspired to violate the False Claims Act by causing the submissions of false or fraudulent claims, conspired to make and use, or cause to be made or used, false records material to false or fraudulent claims, and conspired to withhold Medicare overpayments from being returned to the government. As a result, Medicare overbillings by Amedisys revealed in an audit certification conducted by Defendant E&Y were covered up and the billing schemes in place at Amedisys that resulted in the false billings identified by E&Y continued unabated, resulting in additional false or fraudulent claims to Medicare.

6.     By these actions and the other actions detailed herein, the Defendants have violated several laws, including without limitation, the FCA and the Medicare and Medicaid

2

Patient Protection Act, also known as the Anti-Kickback Statute ("AKS"). Defendants' violations of the AKS give rise to liability under the FCA. The purpose of these unlawful activities was to encourage referrals of patients to Amedisys as well as to cause overutilization of home health care services and higher reimbursement rates than should have been paid or allowed.

7. Defendants' fraudulent conduct has had a dramatic negative financial impact on Medicare and the government. According to the company's own public filings, in the most recent year (2009), Medicare payments accounted for almost 90% of Amedisys' net service revenues, which totaled $1.5 billion that year. Plaintiff estimates that damages caused to the Medicare program by Defendants' violations of the FCA exceed three quarters of a billion dollars as of the date the original complaint was filed.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Under 31 U.S.C. § 3730(e)(4)(A), there has been no statutorily relevant public disclosure of substantially the same "allegations or transactions" alleged in this Complaint. Even to the extent there has been any such public disclosure, Plaintiff meets the definition of an original source, as that term is defined under 31 U.S.C. § 3730(e)(4)(B). Specifically, Plaintiff voluntarily disclosed to the Government the information upon which allegations or transactions at issue in this complaint are based prior to any purported public disclosure under 31 U.S.C. §§ 3730(e)(4)(A). Alternatively, Plaintiff has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and, Plaintiff voluntarily provided the information to the

3

Government before filing its complaint. Plaintiff therefore qualifies as an "original source" of the allegations in this Complaint such that the so-called public disclosure bar set forth at 31 U.S.C. § 3730(e)(4) is inapplicable.

9.     Plaintiff concurrently served upon the Attorney General of the United States and the United States Attorney for the Eastern District of Pennsylvania the original complaint and a written disclosure summarizing the known material evidence and information in the possession of Plaintiff related to the original Complaint, in accordance with the provisions of 31 U.S.C. §3730(b)(2). The disclosure statement is supported by material evidence, and documentary evidence has been produced with the disclosure. The documents referenced in the disclosure statement, and those produced in connection therewith or subsequently, are incorporated herein by reference.

10.     Plaintiff shall serve upon the Attorney General of the United States and the United States Attorney for the Eastern District of Pennsylvania a copy of this Third Amended Complaint.

11.     This Court has personal jurisdiction and venue over the Defendants pursuant to 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a) because those sections authorize nationwide service of process and because each Defendant has minimum contacts with the United States. Moreover, Defendants can be found in, reside, and transact business in this District.

12.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because each Defendant transacts business in this judicial district, and acts proscribed by 31 U.S.C. § 3729 have been committed by Defendants in this District. Therefore, venue is proper within the meaning of 28 U.S.C. §1391(b) and (c) and 31 U.S.C. § 3732(a).

4

**PARTIES**

13.     The real party in interest to the FCA *Qui Tam* claims herein is the United States of America. Accordingly, at this time, Relator is pursuing its cause of action on behalf of the United States on the FCA *Qui Tam* claims set forth herein. *See, e.g.*, 31 U.S.C. § 3730(b)(1).

14.     Plaintiff CAF Partners is a general partnership organized under the laws of the State of Delaware. It is comprised of individuals who bring this *Qui Tam* action based upon direct and unique information obtained about Defendants, or those with whom the Defendants conduct business. The identity of these partners/individuals has been provided in the pre-filing Disclosure Statement(s) produced to the United States pursuant to the Federal FCA. CAF Partners and its individual partners will be referred to herein as "Plaintiff", "Relator", and/or "CAF Partners".

15.     Defendant Amedisys is a publicly traded corporation based in Baton Rouge, Louisiana. Amedisys currently provides home health and hospice services to patients in 40 states within the United States, the District of Columbia and Puerto Rico. As of December 31, 2009, Amedisys owned and operated 521 Medicare-certified home health agencies and 65 Medicare certified hospice agencies. During the past four years, Amedisys has nearly tripled its net service revenue from $541.1 million in 2006 to $697.9 million in 2007 to $1.2 billion in 2008 to $1.5 billion in 2009. During 2006, 2007, 2008 and 2009, Amedisys received 93%, 89%, 87% and 88%, respectively, of its net service revenue from Medicare.

16.     Amedisys executives with knowledge of the fraudulent activities alleged herein include Founder and Chief Executive Officer William "Bill" Borne, and former co-founder and Chief Operating Officer, Larry Graham. Working closely with Larry Graham was Senior Vice President of Clinical Operations, Alice Ann Schwartz. A registered nurse, Ms. Schwartz was

rapidly promoted within Amedisys and, in August 2004, added the title of Chief Information Officer ("CIO") to her clinical responsibilities. Both Mr. Graham and Ms. Schwartz left the company in September 2009 under sudden and unexplained circumstances.

17. On or about Friday, September 4, 2010, and then again on or about Sunday, September 6, 2010, immediately following Mr. Graham's departure, his executive assistant, Kethlen Owens, was seen entering corporate headquarters around midnight and leaving a short time later with what appeared to be boxes of documents and a computer.

18. Defendant E&Y is an international public accounting firm. E&Y maintains its headquarters at 5 Times Square, New York, New York, 10036. E&Y is the United States' arm of Ernst & Young Global. Auditors from the E&Y offices situate in Houston, TX (Erik Shannon), Dallas/Forth Worth, TX (Ododo Enabulele) and Atlanta, Georgia (Lloyd Haggard) were the principal participants from E&Y for the case-mix audit at issue in this Complaint. According to E&Y, the company has the largest and most diversified group of professionals dedicated to Medicare and Medicaid regulatory services among professional services firms. E&Y provides assistance to health industry clients in cost report preparation, financial modeling, appeals before the Provider Reimbursement Review Board, and reimbursement-related litigation.

## THE MEDICARE PROGRAM

### A. General Provisions

19. The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, (hereinafter "Medicare"), is a health insurance program administered by the Government of the United States that is funded by taxpayer revenue. Medicare is overseen by the United States

6

Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

20.     Medicare was designed to be a health insurance program and to provide for the payment of, *inter alia*, hospital services, medical services and durable medical equipment to persons over sixty-five (65) years of age, and for certain others that qualify under the terms and conditions of the Medicare Program. Individuals/patients who receive benefits under Medicare are commonly referred to as "beneficiaries."

21.     The Medicare program is divided into 2 parts relevant to this action. Part A of the Medicare program covers certain health services provided by hospitals, skilled nursing facilities and, at issue in this case, Medicare Certified Home Health Care Agencies ("CHHCA"), such as Amedisys.    Part B of the Medicare program covers services provided by physicians in connection with home health care services, such as Care Plan Oversight, discussed *infra*.

22.     Home health care under Medicare Part A has no limitations on length of stay, no co-payments, and no deductibles. Medicare covers many of the services provided by CHHCAs, including those provided by Amedisys.

23.     Reimbursement for Medicare claims under Medicare Part A is made by the United States through CMS which contracts with private insurance carriers known as fiscal intermediaries ("FIs") to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395u. In this capacity, the FIs act on behalf of CMS.

24.     The most basic requirement for reimbursement eligibility under Medicare is that the service provided must be reasonable and medically necessary. *See*, *e.g.*, 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50. Medical providers are not

7

permitted to bill the government for medically unnecessary services or procedures performed solely for the profit of the provider. *See id.*

25. Medicare requires every provider who seeks payment from the program to certify and ensure compliance with the provisions of the Anti-Kickback Statute, *infra,* and with other federal laws governing the provision of health care services in the United States. That agreement represents an ongoing obligation, and the provider must notify the government of any change in information or certifications provided.

26. In other words, CMS will not pay a claim if a provider tells CMS or its agent that it provided goods or services: in violation of the AKS; that were medically unnecessary; that were performed solely for the profit of the provider; and/or, that violated another relevant law.

27. Furthermore, it is axiomatic that CMS will also not pay a claim relating to reimbursement for goods or services that were not actually provided.

28. In order to obtain a Medicare provider number and to be eligible to file a claim for payment with Medicare, a home health care agency must submit a Medicare Enrollment Application for Institutional Providers. *See* CMS Form 855A incorporated herein by reference.

29. After obtaining a provider number, the home health care agency would then submit or cause to submit claims to a FI that processed those claims for CMS.

30. As part of that agreement, without which these providers may not seek reimbursement from Medicare, the provider must sign the following certification:

I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

8

Form CMS-855A.

31.     The "Certification Statement" that the provider must sign also contains the following provisions and requirements, *inter alia*, to remain enrolled in Medicare. By signing the "Certification Statement," the provider agrees "to adhere to the following requirements stated in this Certification," which include:

> 1. I agree to notify the Medicare contractor of any future changes to the information contained in this application in accordance with the time frames established in 42 C.F.R. §424.520(b).
>
> 3. I have read and understand the Penalties for Falsifying Information...I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application *or contained in any communication supplying information to Medicare* ...may be punished by criminal, civil or administrative penalties, including but not limited to the denial or revocation of Medicare billing privileges, and/or imposition of fines, civil damages, and/or imprisonment. (Emphasis added).
> . . .
> 8. I *will not knowingly present or cause to be presented a* false or fraudulent claim for payment by Medicare, and *will not* submit claims with deliberate ignorance or reckless disregard of their truth or falsity. (Emphasis added).

32.     The Certification Statement is executed by an "Authorized Official" of the Institutional Provider. An "**AUTHORIZED OFFICIAL** means an appointed official (for example, chief executive officer, chief financial officer, general partner, chairman of the board, or direct owner) to whom the organization has granted legal authority to enroll it in the Medicare program, to make changes or updates to the organization's status in the Medicare program, and to commit the organization to fully abide by the statutes, regulation, and program instruction of the Medicare program." (Emphasis in original).

33.     "By his/her signature(s), an authorized official binds the provider to all requirements listed in the Certification Statement and acknowledges that the provider may be denied entry to or revoked from the Medicare program is any requirements are not met."

9

34.     The certifications made by the provider in the Institutional Provider Agreement, which are mandatory for Medicare enrollment, expressly create a continuing duty to comply with the conditions of participation in and payment by the Medicare program.

35.     Indeed, the authorized official who signs the Certification Statement on behalf of the provider "agrees to immediately notify the Medicare fee-for-service contractor if any information furnished on this application is not true, accurate or complete.  In addition, an authorized official, by his/her signature, agrees to notify the Medicare fee-for-service contractor of any future changes to the information contained in this form, after the provider is enrolled in Medicare, in accordance with the timeframes established in 42 C.F.R. § 424.520(b)."

36.     Accordingly, in the Provider Enrollment Application, and the Certification Statement set forth therein, Amedisys agreed to abide by all Medicare laws, regulations and program instructions applicable to home health care agencies.  Further, it certified it understood the payment of a claim by Medicare is conditioned upon the claims and the underlying transaction complying with such laws, regulations, and applicable program instructions and on the home health care agency's compliance with all applicable conditions of participation in Medicare.  Thus, when Amedisys submitted a claim for payment, it did so subject to and under the terms of its Certification to the United States that the services for which payment is sought were delivered in accordance with federal law, to include without limitation the AKS.

37.     To bill Medicare for services purportedly rendered, Amedisys submitted a claim form (Form 1450) to its fiscal intermediary, Palmetto GBA LLC, which was responsible for administering Amedisys' claims on behalf of the government. *See* CMS Form 1450 incorporated herein by reference.

10

38.     At all times relevant to this Third Amended Complaint, before the submission to the fiscal intermediary, Amedisys would submit its Medicare claims to Relay Health in Tulsa, Oklahoma for scrubbing and corrections.

39.     When a Form 1450 was submitted, usually in its electronic form, Amedisys certified that the contents of the claim were true, correct, complete and that the form was prepared in compliance with all Medicare laws and regulations, which includes the AKS.

40.     The information in the claim form, including the Medicare beneficiaries' names, is material to Medicare's payment of the claim to Amedisys.

41.     Similarly, Medicare-participating hospitals which received kickbacks from Amedisys as described below also would have been subject to the certifications and representations set forth in CMS Form 855A and the claims form CMS Form 1450.   The kickbacks hospitals received from Amedisys tainted their services and all resulting claims are false, and materially false, including that medical services provided based on, because of, or by reason of a kickback are *per se* not "reasonable and necessary for the diagnosis or treatment of illness or injury."

42.     Individual physicians and non physicians who render services in connection with home health care, such as Care Plan Oversight discussed in detail *infra*, sign a Medicare Enrollment Application (CMS Form 855I) similar to the Medicare  Enrollment Application signed by home health care agencies and other Institutional Providers (CMS Form 855A).  CMS Form 855I and CMS Form 855A contain virtually identical representations and certifications and are incorporated herein by reference.

43.     In addition, individual physicians and non physicians providing services in conjunction with home health services submit claims using a CMS Form 1500.

11

44.     The CMS 1500 form, incorporated herein by reference, contains the following representations and notices: that the services rendered were "medically indicated and necessary for the health of the patient"; that the information on the claims form was true, accurate and complete; and, that the provider "understand[s] that payment and satisfaction of the claim will be from federal ... funds, and that any false claims, statements or documents, or concealment of a material fact, may be prosecuted under applicable Federal...laws."

45.     The CMS 1500 form also contains the following notice: "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

46.     The kickbacks physicians and their employees received from Amedisys tainted the services and the resulting claims are false or fraudulent, and materially so, including that medical services provided based on, because of, or by reason of a kickback are *per se* not "reasonable and necessary for the diagnosis or treatment of illness or injury."

## B.     The Medicare Home Health Care Benefit

### *1. Reimbursement for Patient Therapy*

47.     Providers of home health care services are typically known as home health care agencies ("HHAs"). HHAs may furnish home health care using their own staff, or they may contract with others to provide services. Additionally, many HHAs are chains that have a central, or "home," office that provides administrative and centralized management services to individual agencies within a chain.

48.     On October 1, 2000, a Home Health Prospective Payment System ("PPS"), was implemented pursuant to § 4603 of the Balanced Budget Act ("BBA") and as subsequently

12

amended by § 5101 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act ("OCESAA").

49. Under the PPS, Medicare pays HHAs a predetermined base rate per Medicare patient/beneficiary which represents payment in full for all costs associated with furnishing home health services previously paid on a "reasonable cost" basis for a single 60 day episode. 42 C.F.R. § 484.200, 484.205. The episode is paid in a 60%-40% manner; 60% upon patient intake or admission and 40% upon submission of a certified patient care plan. Requests for Anticipated Payment (RAPs) are submitted at the beginning of every 60-day episode and may only be submitted to Medicare for payment when: (1) the OASIS assessment is complete, locked or export ready; (2) a physician's verbal orders for home care have been received and documented; (3) a plan of care has been established and sent to the physician; (4) and the first service visit under the plan of care has been delivered.

50. In order for CMS to accurately administer the episode payment rate methodologies described in 42 C.F.R. § 484.215, HHAs are required to submit patient specific comprehensive assessments including the use of standardized classifications as set forth in the Outcome and Assessment Information Set ("OASIS") instrument. 42 C.F.R. § 484.250, 484.55(b)(1).

51. The 60 day episode base payment is subject to predetermined adjustments for geographic variation in wage levels at HHAs throughout the country, as well as for variations in the health condition and service needs of the beneficiary. 42 C.F.R. § 484.215, 484.220, 484.225. If, at the end of the first 60 day episode, the beneficiary is still eligible for care, and the patient is recertified within the final 5 days of the initial episode, a second episode can begin.

13

There are no limits to the number of recertifications so long as the beneficiary remains eligible for the home health benefit.

52.    The aforementioned adjustment to the base episode payment for variations in the health condition and service needs of beneficiaries in a clinical model is referred to as a "case mix adjustment." 42 C.F.R. § 484.202, 484.220. Effectively, a higher case mix is indicative of a sicker patient who requires more care and results in a higher base reimbursement rate. 42 C.F.R. § 484.220.

53.    Pursuant to 42 C.F.R. §§ 484.55(b) *et seq.*, the comprehensive OASIS assessment must be completed "in a timely manner, consistent with the patients immediate needs, but no later than *5 calendar days after the start of care*." (emphasis added).

54.    Different responses to OASIS questions, input by the home health admission clinician, result in different weights and item scores. The items measured by OASIS include clinical, functional, and service needs. When added up, the item scores result in what is known as a domain score which enables a patient to be assigned to a Home Health Resource Group (HHRG) category. From that point, the patient's HHRG category is identified on the claims data by a Health Insurance Prospective Payment System ("HIPPS") code which effectively identifies the HHRG more efficiently to help determine the base rate of payment for each patient.

55.    Prior to 2006, once the OASIS data was collected, HHAs had 7 days to encode (enter into a computer) their OASIS data, check the data for errors and make the assessments export ready. The OASIS reporting regulation required transmission of OASIS assessment data at least monthly, and further specified that assessments must be completed, encoded, and locked within 7 days from the commencement of care. The locked assessment must then be transmitted

14

to the State by the end of the following calendar month. A record was "locked" when it was considered final and ready for transmission to the State.

56.    In or around December 2005, the term "lock", that previously appeared in 42 C.F.R. § 484.20(c)(1), was removed to allow HHAs the option of making corrections to OASIS data at any time without edit warnings. Additionally, HHAs are no longer required to encode OASIS data within 7 days of completing the assessment. Instead, they now have 30 days from the date the assessment was completed to both encode and transmit the final assessment to the State agency or CMS contractor. 42 C.F.R. § 484.20(a).

57.    In accordance with 42 C.F.R § 484.205(e), additional payments, beyond the base episode reimbursement, will be made to an HHA where the imputed cost of a 60 day episode exceeds a threshold amount for each case mix group. These payments are called "outlier payments" and are defined to be "a portion of the imputed costs beyond the threshold." Notably, the estimated total outlier payment is to be no more than 5 percent of total payment under HHPPS (emphasis added). 42 C.F.R. § 484.240.

58.    From 2000 through 2007, Medicare, pursuant to PPS, paid a "high-therapy case mix" bonus of $2,500 in addition to the base reimbursement if the patient received at least 10 therapy visits during an episode in any combination of physical therapy (PT), occupational therapy (OT), and/or speech/language pathology (SLP) therapy services.

59.    On January 1, 2008, CMS implemented a refinement of the PPS system, which included a change to the "high-therapy case mix adjustment" replacing the single therapy threshold of 10 with the current three-tiered threshold of bonus payments at 6, 14 and 20 visits.

60.    Medicaid rules governing payment for home health care services are substantively similar to those of Medicare. Defendants schemes identified herein also defrauded Medicaid.

15

### 2. *Reimbursement for Care Plan Oversight*

61.     Under Federal Regulations, Care Plan Oversight ("CPO") reimbursement permits physicians to bill Medicare for their time overseeing patients who are under the care of a Medicare certified HHA.

62.     CPO reimbursement requires "recurrent physician supervision of therapy involving 30 or more minutes of the physician's time per month." 42 C.F.R. § 414.39(1). Further, to qualify for payment, the physician must have furnished a service requiring a face-to-face encounter with the patient at least once during the six month period before the month for which CPO payment is first billed. 42 C.F.R. § 414.39(2).

63.     Notably, the physician seeking CPO payment may not have a significant ownership interest in, or financial or contractual relationship with, the HHA with which he is affiliating, nor may he be the medical director or employee of the hospice or furnish any services under an arrangement with the hospice. 42 C.F.R. § 414.39(2).

## APPLICABLE FEDERAL LAWS AND REGULATIONS

### A.     The False Claims Act

64.     The FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

65.     The FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim, a violation of federal law for which the United States may recover three times the amount of the

16

damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

66.     The FCA, 31 U.S.C. § 3729(a)(1)(C)), makes any person, who conspires to commit a violation of the FCA, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

67.     The FCA, 31 U.S.C. § 3729(a)(1)(G), makes any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government liable for three times the amount of damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

68.     The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested. 31 U.S.C. § 3729(b)(2).

69.     The FCA, 31 U.S.C. § 3729(b)(1) provides that "(1) the terms 'knowing' and 'knowingly' – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud."

17

70. The FCA, 31 U.S.C. § 3729(b)(4) provides that "(4) the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." A violation of the Anti-Kickback Statute, *see infra*, is material to the government's decision to pay, and a violation of the Anti-Kickback Statute renders resulting claims to Medicare false or fraudulent in violation of the FCA.

## B. The Anti-Kickback Statute

71. The Medicare and Medicaid Patient Protection Act, also known as the AKS or the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that the remuneration and gifts given to those who can influence health care decisions corrupts medical decision-making and can result in the provision of goods and services that are more expensive and/or medically unnecessary or even harmful to a vulnerable patient population. To protect the integrity of the federal health care programs, Congress enacted a prohibition against the payment of kickbacks in any form. The AKS was enacted in 1972 "to provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful . . . and which contribute appreciably to the cost of the Medicare and Medicaid programs." H.R. Rep. No. 92-231, 92d Cong., 1st Sess. 108 (1971), reprinted in 1972 U.S.C.C.A.N. 4989, 5093.

72. In 1977, Congress amended the Anti-Kickback Statute to prohibit receiving or paying "any remuneration" to induce referrals and increased the crime's severity from a misdemeanor to a felony with a penalty of $25,000 and/or five years in jail. *See* Social Security Amendment of 1972, Pub. L. No. 92-603, 241(b) and (c); 42 U.S.C. § 1320a-7b. In doing so, Congress noted that the purpose of the AKS was to combat fraud and abuse in medical settings that "cheats taxpayers who must ultimately bear the financial burden of misuse of funds . . .

18

diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services . . . [and] erodes the financial stability of those state and local governments whose budgets are already overextended and who must commit an ever-increasing portion of their financial resources to fulfill the obligations of their medical assistance programs." H.R. Rep. No. 95-393, pt. 2, at 37, reprinted in 1977 U.S.C.C.A.N. 3039, 3047.

73.    In 1987, Congress again strengthened the Anti-Kickback Statute to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142, Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

74.    The Anti-Kickback Statute prohibits any person or entity from knowingly and willfully offering to pay or paying any remuneration to another person to induce that person to purchase, order, or recommend any good or item for which payment may be made in whole or in part by a federal health care program, which includes any State health program or health program funded in part by the federal government.   42 U.S.C. §§ 1320a-7b(b), 1320a-7b(f).

75.    The statute provides, in pertinent part:

> (b) Illegal remunerations
> 
> \* \* \*
> 
> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
> 
> > (A) To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Federal health care program, or
> > 
> > (B) To purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or

19

> item for which payment may be made in whole or in part under
> a Federal health care program,
>
> Shall be guilty of a felony and upon conviction thereof, shall be
> fined not more than $25,000 or imprisoned for not more than five
> years, or both.

42 U.S.C. § 1320a-7b(b).

76. A recipient of remuneration is also liable under the AKS, 42 U.S.C. §1320a-

7(b)(1), if he or she:

> "knowingly and willfully, solicits or receives any remuneration, including
> any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in
> cash or in kind, in return for referring an individual to a person for the
> furnishing or arranging for the furnishing of any item or service for which
> payment may be made in whole or in part under a federal health care
> program, or in return for purchasing, leasing, ordering, or arranging for or
> recommending purchasing, leasing, or ordering any good, facility, service,
> or item for which payment may be made in whole or in part under a
> federal health care program"

77. In addition to criminal penalties, a violation of the Anti-Kickback Statute can also

subject the perpetrator to exclusion from participation in federal health care programs (42 U.S.C.

§ 1320a-7(b)(7)), civil monetary penalties of $50,000 per violation (42 U.S.C. § 1320a-7a(a)(7)),

and three times the amount of remuneration paid, regardless of whether any part of the

remuneration is for a legitimate purpose, 42 U.S.C. § 1320a-7a(a).

78. In 1991, the Inspector General of the Department of Health and Human Services

the ("HHS OIG") promulgated regulations under the AKS. *See* HHS OIG Anti-Kickback

Provisions, 56 Fed. Reg. 35952, 35958 (1991).

79. Concern about improper marketing practices prompted the Inspector General of

the Department of Health and Human Services to issue a series of Special Fraud Alerts in 1994

concerning various practices that could run afoul of the AKS. *See* Special Fraud Alert:

20

Prescription Drug Marketing Schemes, 59 Fed. Reg. 65,376 (Dec. 29, 1994); see also Fed. Reg.

Dec. 19, 2004.

80.     In one Fraud Alert issued in October 1994 (and contained in the above), the OIG

stated, *inter alia*,

> Generally, a payment or gift may be considered improper …if it is:
> o   Made to a person in a position to generate business for the paying party;
> o   Related to the volume of business generated; and
> o   More than nominal in value and/or exceeds fair market value of any legitimate
>     service rendered to the payer, or is unrelated to any service at all other than
>     referral of patients.

81.     The Anti-Kickback Statute not only prohibits outright bribes, but also prohibits

any payment or other remuneration by a company to a physician or other person which has as

one of its purposes the inducement of the physician to refer patients to the company or the

inducement of the physician to influence or recommend the prescribing of the product. As

articulated *supra*, the AKS is very broad in plain language and purpose: it prohibits offering or

paying *any* remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly

or covertly, in cash or in kind. *See* 42 U.S.C. § 1320a-7b(b)(2)(B) (emphasis added).

82.     The AKS further defines "remuneration" to include "transfers of items or services

for free or for other than fair market value." *Id.* § 1320a-7a(i)(6).  Perhaps underscoring the

breadth of the statutory definition, the HHS OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952,

35958 (1991), broadly define the term "remuneration" as "anything of value in any form

whatsoever." *See also* OIG Compliance Program Guidance for Pharmaceutical Manufactureres,

66 Fed. Reg. 23731, 23734 (May 5, 2003) (AKS addresses the offer or payment of "anything of

value").

83.     The Patient Protection and Affordable Care Act, Publ. L No. 111-148, 124 Stat.

119 § 6402(f)(1) (2010) ("PPACA"), which became law on March 23, 2010, leaves no doubt that

21

violations of the AKS give rise to a violation of the FCA, by providing: "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for the purposes of [the False Claims Act]." In other words, pursuant to the PPACA, claims for items or services billed to government-funded healthcare programs (including Medicare) "resulting from" a violation of the anti-kickback statute are "false or fraudulent claims" under the FCA.

84.    The PPACA also clarified the intent requirement for the AKS, and now provides that "a person need not have actual knowledge of this section or specific intent to commit a violation" of the AKS in order to be found guilty of a "willful violation." Accordingly, proof that a defendant knew of and specifically intended to violate the AKS is no longer required, instead proof that the defendant intended to perform the actions that violated the anti-kickback statute gives rise to a violation.

85.    At all times relevant to this Complaint, compliance with the Anti-Kickback Statute has been a condition to participation for a health care provider under Medicare. Moreover, compliance with the AKS is a *condition of payment* for claims made to Medicare for reimbursement for services, including home health services.

86.    For example, under 42 U.S.C. § 1395y(a)(1)(A), "nonpayment may be made [under the Medicare statute] for any expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury."

87.    Kickbacks are, by definition, not "reasonable and necessary for the diagnosis or treatment of illness or injury."

88.    HHS-OIG has promulgated certain exceptions to the reach of the AKS know as "safe harbors". One of these safe harbors is "personal services" however, this exception is

22

inapplicable here given that the doctors were being reimbursed in excess of fair market value and/or for services that were not provided. 42 C.F.R § 1001.952(c). *See also* 64 Fed. Reg. 63518, 63530 (Nov. 19, 1999) (final rule).

## FACTS AND ALLEGATIONS

### A.   Overview

89.    As described more fully below, Amedisys engaged in a multi-faceted scheme to fraudulently increase their corporate revenues through Medicare reimbursement for home health care.

90.    First, as stated above, from 2000 through 2007, Medicare paid a "high-therapy case mix" bonus in addition to the base reimbursement if a patient received 10 or more therapy visits during a 60 day episode. As a result, from at least 2003 through 2007, the manipulation of case mix data to achieve 10 – 12 therapy visits became a key component for maximizing reimbursement at Amedisys.

91.    When CMS refined the HHPPS system on January 1, 2008 to change to the "high-therapy case mix adjustment" from a single therapy threshold of 10 to the current three-tiered threshold of bonus payments at 6, 14 and 20 visits, Amedisys shifted its internal pre-determined clinical tracks to take advantage of the new PPS system.

92.    Clinical tracks, also known as clinical pathways, care pathways, critical pathways, or care maps, are one of the main tools utilized to standardize and manage healthcare through systematic planning and treatment. Since their introduction into the home health care arena in or around 1991, care maps have been adopted as an integral part of disease management programs by the industry including Amedisys.

93.     A statistical analysis of CMS claims data, based solely on claims for Amedisys beneficiaries, shows that beginning in 2008, there was a dramatic shift away from therapy visits at 10 – 12 visits per episode and now cluster at 14 - 16 and 20 - 22.

94.     Specifically, between 2007 and 2008 therapy visits at 10-11-12 per episode, dropped by over 50% and therapy visits at 6, 14, and 20 increased 8%, 33% and 41% respectively. Further, during the same time period the aforementioned cluster at 10, 11 and 12 visits dramatically decreased and new mini clusters at 6, 14 and 20 visits emerged coinciding neatly with the new 2008 PPS bonus system.





95.     Second, as part of its scheme to defraud Medicare, Amedisys also caused patients to be unnecessarily recertified as needing additional 60 day episodes of home health care.

96.      Third, Amedisys uses various forms of kickbacks to induce patient referrals both from physicians and from hospitals, in violation of the AKS. For example, since 2005 Amedisys has used a thinly veiled kickback scheme known as Mercury Doc to entice physicians to refer patients to Amedisys with the promise of CPO billing. By the company's own admission in February 2009, the impact of Mercury Doc has been to increase physician referrals to the point that 16% of the referrals come through the Mercury Doc portal, a number that grew dramatically from 1% the year before.

97.      Also, since at least 2004, Amedisys has formed what they call the "Physician Advisory Council" which conducts annual retreats known as Physician Consultant Meetings consisting of 3-day all-expense paid trips to luxury hotels sponsored by Amedisys and offered to a handpicked group of Physician Consultants and their spouses/guests/families.

98.      Further, in violation of the AKS, in order to expedite and induce patient referrals by hospitals, Amedisys provides home care "Nurse Liaisons" also known as "Account Managers" - at no charge - to carry out intake services properly performed by the hospitals themselves. According to an OIG Fraud Alert published June 1995, home health care companies that provide hospitals with discharge planners, home health coordinators or home care liaisons in order to induce referrals can constitute a kickback.

99.      Amedisys is fully knowledgeable of its misconduct and the rampant fraud. Ironically, Amedisys prides itself on its proprietary processes and internal auditing. One example of the company's devotion to risk assessment is found in its revealing "2009 Annual Internal Audit Risk Assessment" in which Amedisys managers were asked to respond to an open-ended question about the company's "Top Overall Risks."

25

100. Notably, the results of the internal assessment cited "Billing" as the number one

overall risk at Amedisys as judged by Amedisys' own employees. Specifically, employees listed

concerns about the following specific billing areas:

> -Fraudulent billing
> -Billing processes not being followed
> -Billing for services that are not medically necessary
> -Billing without orders to support

101. Following "billing," "compliance" came in second place with the managers

interviewed, more specifically:

> -Medicare compliance
> -Selling Amedisys services and DM programs from a compliance standpoint
> -Lawsuits relating to compliance
> -Inappropriate recertifications (4)
> -OIG audit with findings

102. Finally, "Field Staffing Model" actually tied with "Compliance" with the

respondents citing:

> -Employee dissatisfaction
> -Our clinical staff is so thinly staffed that we run the risk of poor service
> -Overextending the existing top management staff
> -Intake of patients
> -QCC roll-out happened too fast to adequately get staff trained
> -The current staffing model for clinical managers having 1 CM to oversee 275
> patients does not provide adequate oversight of care or oversight of quality of the
> care that we provide.  The model is a huge risk for us and our patients.
> -Assuring clinical accountability
> -Lack of supervisory personnel at the agency level
> -Inadequate nursing staff levels
> -Ineffective branch oversight and support at the AVP level, allowing agency
> processes to fall apart, resulting in decertification and / or patient injury.

103. According to this survey of its *own staff*, which included all four of its "C-Level

executives," Defendant Amedisys operates fraudulently; is out of compliance with CMS rules;

26

and is so understaffed in nursing (having forced nurses out in order to hire more physical therapists to support corporate therapy goals) that patients run the risk of getting poor service.

104. The following details many of the ways Defendant Amedisys, in concert with others including Defendant E&Y, has violated the FCA.

## B. Amedisys' Systematic Manipulation of Case Mix Data and Improper Inflation of Therapy Visits to Hit Bonus Payment Triggers

105. Amedisys improperly manipulates case mix data submitted to CMS, making its patients appear to be sicker than they are, in order to both inflate the Medicare base reimbursement per episode, and justify extra, unnecessary therapy visits to qualify for high-therapy adjustment bonus payments from at least 2003 until the present.

106. In various earnings calls and investor presentations, Amedisys states that its patient population is at least 10% more acute than the average home health agency.

107. Notably, while Amedisys claims a "sicker" patient, its public filings suggest that it spends *less* on patients on average than competitors, $77 versus $113 per visit.

### 1. Manipulation of "Co-Morbidity" to Increase Medicare Base Reimbursement Rate

108. To justify its high therapy reimbursement, Amedisys creates the illusion that it has "sicker" patients on service. Amedisys accomplishes this billing scheme by manipulating patient data used to influence reimbursement levels and/or generate claims submission to Medicare, as detailed *infra*.

109. Patient acuity is reported as case mix data, which is the assessment of a patient's condition, utilizing an OASIS instrument, which home health agencies report to CMS to establish the base rate of reimbursement. The standard reimbursement for a patient episode is adjusted higher or lower according to the case-mix data provided to CMS.

110. As part of Amedisys' training process for Directors of Operations ("DOOs"), a 2005 Training Manual repeatedly emphasizes the corporate drive to increase revenue through high case-mix scores. Specifically, DOOs are instructed that "high case-mix referrals will positively impact the agency financially." Further, they are directed to "Focus marketing efforts on referral sources that have patients with increased rehabilitative needs (i.e. orthopedic patients) as these patients typically have higher case-mix scores resulting in greater revenue."

111. Through both Point-of-Care and AMS2, Amedisys effectively operates to ensure the inclusion of irrelevant co-morbidities (i.e. secondary diagnoses) thereby inflating base reimbursement per episode, justifying higher therapy utilization and, consequently, high-therapy reimbursement bonuses.

112. Generally, CMS instructs that HHAs should avoid listing secondary diagnoses as part of the case mix assessment that are of mere historical interest and without impact on patient progress or outcome.

113. In 2008, CMS expanded the number of secondary diagnoses (co-morbidities) to which case mix points were assigned; accordingly, the addition of improper co-morbidities directly impacts Medicare base reimbursement.

114. When the corporate directives and training manuals are examined in conjunction with the use of its proprietary software system, AMS2, and its field laptops known as the Point-of-Care system, Amedisys is able to make its patients "look sicker" by improperly manipulating case mix data, including adding multiple ineligible or inappropriate diagnoses to a patient's primary diagnosis.

### a.  Point-of-Care Application

115.  When a patient is prescribed home health care, a field nurse, also known as a clinician, is assigned from a local agency to go to the patient's home and do an initial assessment, using the OASIS questions, in order to formulate a plan of care. In 2007, Amedisys rolled out a program called "Point-of-Care" which is essentially a laptop program designed to digitize the collection of OASIS data by prompting questions designed to elicit specific responses from patients.

116.  As part of the data collection, the nurse is prompted to ask for a list of medications taken by the patient. Due to the fact that patients often cannot remember what medications they are on, nurses are prompted to inventory medicine cabinets and must list each and every medication that is found, regardless of whether or not they are currently being taken by the patient. The inclusion of irrelevant and outdated prescriptions contributes directly to Amedisys' case mix upcoding scheme as described *infra*.

117.  Point-of-Care was designed in close coordination with Clinical Operations, Project Management and the Amedisys IT department, specifically the Senior Vice President of Strategic IT, Pete Hartley, to include prompts and pop-up reminders, known as "smart edits," to nurses in the field to enhance patient acuity. The prompts, according to former employees, were virtually impossible to override and resulted in higher OASIS scores which lead, as explained *supra*, to higher case-mix and base reimbursement rates.

118.  By way of example, the smart edit would require the nurse to answer a question and then tell him or her that they should consider the patient for a therapy program. Notably, according to a former employee and member of Plaintiff CAF Partners, the smart edits were designed to consistently trigger a therapy recommendation which, in turn, would increase the

29

number of visits and trigger the bonus payment. These smart edits prevented freeform input by the clinicians and instead only permitted the clinician to click on one of the pre-fabricated selections.

**b. AMS2**

119. Once the data collection through Point-of-Care was complete, the nurse virtually connects his or her laptop to the AMS2[1] billing system at Amedisys headquarters to sync the patient medical profile data with the billing data previously entered.

120. As the complete patient profile is updated to include the OASIS data collected by the field nurse, AMS2 was designed to process the information through a series of "look up tables." Designed for the sole purpose of maximizing the potential to increase case-mix, the look up tables process all of the OASIS data downloaded from the point of care laptop and then cross reference the assessment data with potential secondary diagnoses which could be used to increase a patient's case mix assignment.

121. For example, if a patient presents with a post-operative knee replacement, AMS2 is programmed to search that patient's medical history, as collected by the field clinician, including any medications, for potential additional diagnoses. As such, if AMS2 identifies the knee replacement patient has a medication listed for hypertension, it will automatically suggest the addition of hypertension (HTN) as a secondary diagnosis, thereby making the patient appear sicker through the inclusion of a co-morbidity and adding case mix points.

122. An extremely common problem among adults, hypertension does not have an effect on most therapies offered by home health and, therefore, should not be considered as a co-

---

[1] AMS2 is the second generation of Amedisys' proprietary software, AMS. According to Relator, there is another version in development to be called AMS3.

morbidity. Further, in recognition of the fact that HTN is ripe for abuse as a way to add case mix points, as of January 2011, CMS has eliminated any points attributable to HTN.

123.    Evidence of the abuse of HTN can be seen in an analysis of 300,000 start of care (SOC) assessments showing the "top" secondary diagnoses by ICD-9 code for the years 2005, 2007 and 2008. Not surprisingly, 46.9% of secondary diagnoses present in all SOC OASIS assessments analyzed by Outcome Concept Systems, an Amedisys partner described in detail, *infra*, were for hypertension.

124.    Once AMS2 finishes processing the OASIS data from the point of care laptop, it generates a list of potential secondary diagnoses which are then reviewed by Quality Care Coordinators ("QCCs") and added to the patient's profile oftentimes regardless of whether or not the alleged secondary event is an issue in the episode, has been completely controlled for years or requires no attention from home health services. This review by QCCs occurs within the 5 day assessment window described *supra* and defined by 42 C.F.R. § 484.55(b)(1).

125.    As an important aside, prior to the creation of the QCC position, Clinical Managers ("CMs") were responsible for supervising field clinicians, reviewing OASIS assessments and determining patient coding, including the addition of any secondary diagnoses. In or around September 2008, Amedisys made the decision to drastically reduce the number of CMs located within each agency and replaced them with remotely located QCCs. The QCCs work directly for the Episode Management department[2] headed by Tasha Mears whereas the CMs fell under the purview of Clinical Operations. Despite these changes, both the CMs and the QCCs were given basically unfettered access to OASIS assessments and were responsible for reviewing and coding as the assessments came in.

---

[2] This department was renamed "Quality Management and Analytics" in 2008.

31

126.    Prior to the shift to the QCC system, once the POC laptop data was uploaded to AMS2, the CM would review the new patient record and OASIS assessment through the Clinical Manager Dashboard function available at each agency to the CM. In the dashboard function, the CM is prompted by pop-ups called "Clinical Trigger Errors" seemingly designed to generate secondary diagnoses to maximize scores.

127.    In the following example, from a 2008 presentation to the Amedisys Board of Directors by Tasha Mears, the trigger error is designed to have the CM code the patient for a heart diagnosis as well as a wound diagnosis.



128.    The first box actually demonstrates how AMS2 is programmed to "hunt" for additional diagnoses by reviewing the patient medication list and medical history, regardless of the relevance of such a diagnosis to the home health referral, and make the suggestion that those diagnoses be added as part of the coding.

129.    The Override box is even more revealing evidencing that AMS2 is designed to automatically add the additional diagnoses, in this case heart disease and wound care, to the patient's assessment unless otherwise instructed.

130.    These clinical quality edit messages work to ensure that potential reimbursement for each patient is being systematically and methodically maximized through a system of programmed manipulation.

131.    An internal OASIS Reference Guide from Amedisys reveals the motivation for the addition of some of these diagnoses. Specifically, the Guide sets forth the CMS dictated point values assigned to different diagnoses, revealing, for example, that the addition of a Neurological diagnosis results in the addition of 20 case-mix points, and the addition of an orthopedic diagnosis results in an 11 point increase.

132.    In addition to its functions to increase case-mix, AMS2 was also designed to be able to generate "Episode Countdown" reports on a daily basis and send them to Directors of Operations ("DOOs") at the company's remote agencies. These reports were used to maximize billing by identifying patients who have "2 weeks left in their current episode and have only 7-8-9 therapy visits completed" so as to prompt DOOs to get to the goal of 10 visits in order to receive the $2,500 bonus.

133.    The Financial Management section of the 2005 DOO Operating Manual specifically instructs the DOOs to run the aforementioned episode countdown report from their AMS2 dashboard function a minimum of twice a week in order to continue maximizing reimbursement.

33

134.    Amedisys has a standing instruction that specific co-morbidities (such as HTN) to "always" be coded even where they only *may impact* the care in the absence of a documented active intervention.

### 2.    Use of "Clinical Tracks" to Hit High Therapy Bonus Thresholds

135.    From at least 2003 through 2007 when the bonus threshold was 10, Amedisys improperly manipulated the number of therapy visits per episode to cluster at 10 – 11 – 12 therapy visits in order to receive the bonus "high-therapy" adjustment.

136.    In 2008, when CMS changed the rules for therapy bonuses from a single bonus threshold at 10 visits per episode to a staggered schedule at 6-14-20 visits per episode, Amedisys' therapy visits changed accordingly.

137.    As graphically illustrated, *supra,* the therapy cluster at 10-11-12 disappeared and new clusters at 6, 14-16 and 20-22 appeared starting in 2008. In other words, patients who required 10 to 12 visits in 2007 required either 14-16 or 20-22 visits in 2008. Curiously, internal Amedisys documents appear to confirm that there was no substantive change in the therapy itself; the only difference between 2007 and 2008 was the thresholds for eligibility for the high therapy bonus reimbursement set by Medicare.

138.    In order to systematically achieve "high-therapy" bonus thresholds, Amedisys created a proprietary set of "clinical tracks" consisting of standardized recommendations for the number of therapy visits by diagnosis. Amedisys created its "clinical tracks," ostensibly, to standardize care provided to its patients based upon evidenced-based medicine. However, "clinical tracks" quickly became a corporate directive to justify high therapy utilization in order to maximize reimbursement.

34

139.    For example, according to an internal document titled "Rehab Clinical Tracks" from February 2003 when the bonus therapy reimbursement threshold was 10, the maximum suggested number of visits for a patient requiring any kind of balance therapy was 12. However, after August 2007, when CMS implemented the threshold change, an internal document from September 2007 shows the suggested minimum therapy visits at 16 for the same balance therapy patient.

140.    Upon closer comparison of the documents, it is remarkable that while there was no significant change in the therapy itself, in 2003, no clinical tracks recommended 16 therapy visits, however, by 2008, 16 visits was the Amedisys standard for advanced rehabilitation.

141.    In fact, up until the PPS changes in 2008, Amedisys indoctrinated its DOOs into believing that "the therapy threshold is 10 or more visits in a 60 day episode" and that "the OASIS assessment should have a functional score that supports the patient requiring this much therapy". Remarkably, in this presentation from 2005, and others like it, Amedisys directly instructed all of its DOOs to manipulate the OASIS assessments to achieve the therapy threshold.

142.    Similarly, a power point presentation by Episode Management in 2007 also reiterates to the DOOs that 10 visits per episode is what CMS has determined to constitute "meaningful therapy" and that anything less than that is not considered meaningful and suitable for Amedisys patients.

### a.    Introduction of New Therapy Programs in 2007 to Hit the Revised Medicare High Therapy Bonus Thresholds

143.    In mid-2007, in anticipation of the new HH PPS high-therapy bonus threshold and the increased demand for therapies to achieve the 14 and 20 visits per episode, Amedisys' Disease Management Department went into high gear and reinvented wound care, previously a traditional nursing function covered under the base reimbursement, as "therapy" and

35

aggressively marketed a rebranded "therapy" program "Balanced For Life" ("BFL"), targeting "fall prevention" among its patients.    Amedisys' scheme surrounding the Balanced for Life Program is detailed *infra*.

144.    In addition, in 2007, as part of the corporate strategy to increase revenue, Amedisys began pushing its agencies to "staff to the lowest discipline." This approach was discussed within the company and, according to an internal document outlining the Case Mix Refinement Strategy, was listed as an initiative for August through December 2007.

145.    In order to "operationalize Staffing to Lowest Discipline" as a model, Amedisys started to use less expensive LPNs in place of RNs and put RNs on a schedule that made them ineligible for benefits unless they could accomplish 30+ visits per week. In geographic areas with long distances between patients, attaining the 30+ visits per week was a practical impossibility, and experienced nurses who had for years been paid a salary with benefits were now paid by the visit with no benefits.

146.    At the same time, Amedisys was paying Physical Therapists (PTs) signing bonuses of anywhere from $5000 to $15,000 in order to carry out a new therapy initiative calculated to meet the new Medicare tiered therapy bonus thresholds, "Wound Care: A Therapy Approach."

147.    Thus, beginning in 2007, Amedisys reinvented wound care - a common home health service that is traditionally performed by trained nurses and covered under the base episode reimbursement at no additional charge - as "therapy" to be performed by minimally trained physical therapists and, more often, by physical therapy assistants in order to inflate therapy visits to obtain high-therapy bonus payments.

36

148.    Prior to 2007, wound care at Amedisys was performed by skilled nurses. Although some PT schools teach wound care, it was not customary for PTs to have the level of training necessary for proper wound care. In fact, the transition to wound care as a therapy was so unusual that many former employees including a DOO from Maryland reported that they were not comfortable with having PTs perform wound care because they did not have the training that nurses do.

149.    In addition to hiring new physical therapists, Amedisys used an outside staffing company, Arnica, essentially a traveling therapist program, to provide PTs to agencies on a rotating basis. In 2007, Amedisys acquired Arnica to supplement its own physical therapist staffing but kept it as a distinct entity within the company.

150.    An Amedisys document from October 2007 entitled "Rational [*sic*] for Clinical Tracks based on Diagnosis," part of which has been reproduced below, shows Therapy Wound Care clinical tracks for both uncomplicated and complex designed to capitalize on the new therapy bonus thresholds established by CMS.

13.    Therapy Wound Care I - 14 visits
   a.  Uncomplicated wound
   b.  PT and /or OT/SLP
   c.  Might need a modality
   d.  Stage I or II, Superficial wounds, Surgical wound
   e.  Possibly needs positioning/functional mobility retraining/cognitive and/or oral intake management

14.    Therapy Wound Care II - 20 + visits
   a.  Complex, non-healing wound
   b.  PT and /or OT/SLP
   c.  Co morbidities
   d.  Needs modalities
   e.  Possibly needs debridement
   f.  Needs positioning/functional mobility retraining/cognitive and/or oral intake management
   g.  Stage III and IV, Full thickness wounds

151.    Between 2003 and 2007, Amedisys renamed many of their clinical tracks as different programs were developed. For example, in mid-2007, Amedisys implemented a newly branded fall prevention therapy known as "Balanced For Life" ("BFL") which became the new name for the earlier iterations called "Better Balance at Home" and "Better Strength at Home."

152.    The aforementioned "Rational for Clinical Tracks based on Diagnosis" document from October 2007 shows that the first BFL clinical track (BFL001) justified an unbelievable 16 therapy visits for "Any diagnosis that scores at fall risk," thereby sufficiently meeting the company's therapy per episode goals and successfully breaking into the tiered PPS bonus system. The sweeping definition of the qualifying diagnosis for BFL 001 (and in turn a definitive 16 therapy visits without regard for what the patient's medical issue may be or its severity) is indicative of Amedisys' intent to abuse the BFL program to hit therapy thresholds to achieve desired financial outcomes at the expense of providing medically necessary care, and fully 25% more therapy than the highest risk patient under the former Better Balance program.

153.    The next clinical track (BFL002) was designated for patients diagnosed with a "High Fall Risk," which Amedisys considered to be patients with anything that could be tripped over such as rugs, pets, or shoes, or anyone who had ever reported inner ear conditions. A BFL002 designation carried with it the moniker "Balanced for Life with Deconditioning BFL002" and generated a clinical tracks recommendation of an astounding 22 visits. Again, this "one size fits all" approach is designed to serve Amedisys' financial interests.

154.    Amedisys made BFL one of its most important marketing initiatives of 2007 and 2008, instructing account executives to pitch it to all physicians referring patients. In one 2008 marketing brochure entitled "Home Health Care 'balanced for life' A Fall Prevention Program for Seniors," Amedisys claims: "The Amedisys Balanced for Life Program enables us to deliver

the highest quality of care for our patients while measuring outcomes and reducing patient need for urgent/emergent care due to falls."

155.    The same brochure also boasts "rehabilitation of balance and vestibular dysfunction" and "reduced hospitalization". According to a former Amedisys RN, "vestibular and rehab don't go together. Who tests the inner ear? Inner ear problems may respond to medication but not to so-called balance training". Furthermore, the nurse added that "The Tinetti scale [the standard used in BFL] only tests balance and there is no evidence that using the scale will prevent falls thereby making BFL a driver of therapy visits."

156.    Not only was BFL based on questionable scientific evidence, the standards for inclusion in the program used by Amedisys were vague and failed to conform to CMS guidelines. Specifically, Amedisys standards for inclusion in BFL included a "Fall Risk Assessment", a part of which is reproduced below, in which three "yes" answers to questions such as "Are you 65 or older?"; "Do you have a fear of falling?"; and, "Do you have painful feet?" would qualify the patient for participation.

**ARE YOU AT RISK FOR FALLS?**

Falls are a serious health concern related to many diseases, medical conditions or medications you may be taking. Falls can result in serious injury that we want to take proactive precautions to prevent whenever possible. To assist in identifying your level of risk; for a fall check any of the following that apply:

Y  N

☐  ☐  Are you 65 years or older?
☐  ☐  Have you fallen within the last 3 months?
☐  ☐  Are you unsteady on your feet or have a general weakness?
☐  ☐  Are you taking any medications that cause fatigue or dizziness?
☐  ☐  Have you had a stroke in the past?
☐  ☐  Do you have a progressive neurological disease?
☐  ☐  Do you have diabetes?
☐  ☐  Do you have neuropathy, arthritis or joint disease of the lower extremities?
☐  ☐  Do you have visual disturbances?
☐  ☐  Do you have fatigue, dizziness or declined agility?
☐  ☐  Do you have a fear of falling?
☐  ☐  Do you have painful feet?
☐  ☐  Do you have to rush to get to the bathroom in time?

**If three or more of these statements apply to you, you may be at high risk for falls and may be a candidate for Balanced For Life. Please discuss with your physician.**

157. According to the CMS guidelines for reimbursement, "services involving activities for the general welfare of any patient, e.g., general exercises to promote overall fitness or flexibility and activities to provide diversion or general motivation, do not constitute skilled therapy."[3] As such, patients answering "yes" to the three questions above, would be entered into the BFL program resulting in Amedisys billing Medicare for services that, on the basis of those questions, could easily be carried out by nonskilled personnel under the base reimbursement rate. In other words, it was not reasonable or medically necessary to bill of rhte services of a *skilled* provider.

158. In spite of the fact that Amedisys actively pitched BFL as a way to reduce the need for "urgent/emergent care" and "rehospitalization," the company knew that it had no documentation to support such assertions, and no justification for the use of skilled therapists. Notably, CMS explicitly states in its Benefits manual that: "Repetitive exercises to improve gait or to maintain strength and endurance and assistive walking are appropriately provided by nonskilled persons and ordinarily do not require the skills of a physical therapist."[4] As such, according to internal documents from 2007 and, in an attempt to justify the program, Amedisys initiated the "Balanced for Life Data Project." The stated purpose of the Data Project was to "provide external validation of the Balanced for Life (BFL) program and to advance the Rehab Research agenda."

159. The Amedisys "Rehab Team" formed to advance scientific validity of the BFL program included Wanda Hull, Vice President of Specialty Programs, Kimberly Marryott, Managing Director of Specialty Programs, and Lisa Newell, Corporate Director of Rehab Research & Quality under the guidance of Tasha Mears, Vice President of Disease Management

---

[3] Medicare Benefit Policy Manual HHA-205.2.A
[4] *Id.*

40

and Alice Ann Schwartz, Senior Vice President of Clinical Operations and Chief Information Officer ("CIO").

160. In 2008 and into 2009, the aforementioned "Rehab Team" attempted to gain academic support and substantiate their claims that BFL was a qualified therapy under CMS guidelines. In furtherance of this effort, the team unsuccessfully sought the assistance of institutions including Yale, Johns Hopkins, and Emory University to justify the use of BFL clinical tracks as evidence-based medicine.

161. Despite the lack of supporting evidence or data, the success of Amedisys' BFL marketing effort known as "BFL Blitz" was celebrated in the Amedisys Employees' Weekly Newsletter, "The Weekly Spirit" on November 11, 2008, "In September, Rehab Specialty Directors, agency operations and the business development team had a Balanced for Life Blitz. Due to everyone's effort, there were 590 BFL referrals that week! Congrats to all the Directors and their hard work!"

162. Remarks by former COO Larry Graham to investors in February 2009 quantified the impact the BFL program had on the company's revenue stating that in the fourth quarter of 2008, the company reported $2960 as the revenue per episode. However, when a patient is enrolled in BFL, that revenue per episode increases by as much as $2000. Based simply on the statements by COO Graham, the Medicare reimbursement from the 590 BFL referrals in one week in September 2008 was a staggering $2,926,400.

163. Relator believes that much of Amedisys' success, both past and present, in growing therapy visits per episode to meet the tiered bonus system can be attributed to the BFL and Wound Care programs.

## C.    Amedisys' Use of Proprietary Software to Manipulate Medicare Billings Through Data Fixes

41

164.    From the secondary diagnosis look-up tables described *supra*, to the inclusion of timers that calculate and monitor pertinent dates, the development of AMS2 was remarkable in that it was designed with a multitude of capabilities to aid in the improper maximization of reimbursement.

165.    Specifically, data in AMS2 is 'scrubbed' on an hourly basis with queries that look at every aspect of data including date exceptions.

166.    A home health agency has 60 days to complete and deliver a course of care to a patient. If those standards are not met, then there are penalties imposed by CMS including requiring the HHA to return money received as partial episode payment, and the inability of the HHA to recertify the patient for additional episodes.

167.    Given the importance of the 60 day time table, AMS2 is programmed to scrub patient data and look for cases that have not fulfilled the mandated requirements for the 60 day episode, these cases are known as "date exceptions".    When AMS2 generates the list of exceptions, the only way to correct the error or exception so a reimbursement claim can be billed and paid by Medicare is to go into the database and manually roll back the start of care ("SOC") date, episode dates, or other dates to put Amedisys' provision of care back in compliance and to prevent Medicare from denying the claim, which if billed accurately and truthfully, would have and should been denied as ineligible for reimbursement. The changing of data in this manner is known as a "data fix."

168.    When AMS2 generates its error or exception report, it appears as a spreadsheet, an excerpt of which is reproduced below:

| | | | | |
|---|---|---|---|---|
| Feature | 460 | Cert period correction | Cert Date Fix | Data Fixes |
| Feature | 469 | Cert period correction | Cert Date Fix | Data Fixes |
| Feature | 472 | Cert period correction | Cert Date Fix | Data Fixes |
| Feature | 536 | Cert period correction | Cert Date Fix | Data Fixes |
| Feature | 567 | Cert period correction | Failed 60 day Integrity Check Covington, GA 3302. Patient PH1091469 | Data Fixes |
| Feature | 598 | Cert period correction | Cert Date Fix - M1373975 | Data Fixes |
| Feature | 708 | Cert period correction | Needs SOC changed. | Data Fixes |
| Feature | 727 | Cert period correction | Cert dates needing to be reverted back to the first episode on the pertinent dates screen. | Data Fixes |
| Feature | 732 | Cert period correction | RDOO CAN'T CHANGE CERT DATES | Data Fixes |
| Feature | 743 | Cert period correction | Cert dates need to be change for patient I1048004 W.Watson | Data Fixes |
| Feature | 744 | Cert period correction | Cert Date need to be change for Patient is M1366049 | Data Fixes |

169. All of the exceptions above indicate the changing of patient certification dates which directly effect the billing of the episode to Medicare.

170. Further, the "cert period correction" "Failed 60 day Integrity Check Covington, GA 3302" indicates that either the patient's care likely exceeded the 60 day episode window, or that Amedisys missed visits during the episode. To correct this issue, Amedisys database analysts (DBAs) go into the AMS2 source database and manually change dates back so that the episode and everything within the episode appears to be in compliance with CMS regulations. Similarly, the excerpt above also indicates changes in the start of care dates (M0030).

171. Additionally, changes to assessment dates, and efforts to cover up those changes to make them comply with CMS regulations, are readily identifiable in an email exchange on Tuesday, March 11, 2008 between Tasha Mears and AMS2 lead programmer, Brannon Byrd. Specifically, Ms. Mears condones the changing of several M0090 dates (final assessment dates) to within the CMS regulated 5 day window prior to the end of an episode. Ms. Mears goes on to instruct Brannon that "We will need to ensure that date matches an actual visit date" again condoning the changing of dates so as to make it appear that the patient assessment was conducted in compliance with CMS regulations.

172. There are two ways in which to effectuate a data fix at Amedisys. If the information is still in the POC laptop system and has not been uploaded from the regional agency

43

to AMS2, upon receiving an integrity error message, the DOO can call the Amedisys help desk which will then freely provide a key code for input to override the automatically generated dates in the POC. The second method of change occurs after the POC has been uploaded to the AMS2 database. Once this happens, the database team or DBA, located at corporate headquarters, must make the correction based on instructions they receive.

173.    Importantly, dates for SOC are generated automatically by POC when the field clinician logs in and begins to enter patient data at the initial visit. There is, therefore, no possibility that human error resulted in the input of an improper SOC date.

174.    A report generated by Mark Little from the second quarter of 2007 through the second quarter of 2008 reflects 443 data fixes executed with the second highest number, 53, categorized as cert period corrections.

175.    AMS2 data changes and data fixes were an accepted IT practice until 2008 when senior IT managers attempted to stop the practice. Attempts to curtail the changes were consistently met with resistance from CIO Schwartz.

176.    In July 2008, some minimal change management processes were permitted which, for the first time in Amedisys history, enabled changes to AMS2 data and programs to be tracked and accounted for. Upon information and belief, many of the change management processes were subsequently abandoned in 2009.

177.    Changes to reimbursement data housed in AMS2 occurred at corporate headquarters through the use of both "user overrides" and "data fixes," as well as so-called "manual adjustments" in the accounting department. Additionally, changes also occurred at the agency level through "user overrides."

44

### D.    Illegal Patient Solicitation and Fraudulent Re-certifications

178.    According to financial analyses of Amedisys' public filings with the Securities and Exchange Commission (SEC), recertification or admitting a patient for subsequent episodes after the initial episode is responsible for as much as two-thirds of Amedisys' reported increase in visits per admission (an admission can include more than one episode) from 2006 through at least 2009.

179.    Given the enhanced revenue potential for re-certifications, former employees, including a clinical manager who worked for an agency in West Virginia in 2008, reported that corporate "wanted a 100% re-certification rate after the first 60-day episode whether it was reasonable or necessary or not."

180.    Pressure on clinical managers and supervisors to increase re-certifications was not the only way the company generated fraudulent reimbursements. Specifically, Amedisys also fraudulently maximized Medicare reimbursement through the Encore Program. Launched in or around October 2005 and headed up by Anita Satterly, Encore was developed as a post-discharge outreach initiative consisting of employees in a call center, and some working remotely from home, placing "sunshine" telephone calls to patients in pre-determined increments following their discharge.  Specifically, the calls would be placed 10 days, 6 weeks, and 6 months after the patient was discharged from HHA services.

181.    Ostensibly, the program's purpose is to gather patient satisfaction data and self-reported information about the patient's health status.  In fact, Encore is a means of soliciting recertifications under the guise of obtaining patient satisfaction data.

182.    According to an Encore marketing brochure from 2008, Encore was positioned as a "disease management service to help patients achieve and maintain an optimal level of health

after discharge from home health care services [by] enhancing the care process by giving physicians additional knowledge…[to] make informed health care decisions regarding his/her patients." The reality of the program suggests that Encore callers were tasked with increasing corporate revenue through patient follow up and re-certifications.

183.    Encore callers were instructed to ask questions designed to prompt patients to answer in a way that would result in the referral for additional therapy. By way of illustration, the caller would inquire of the patient "Have you had any falls since you were discharged?" The patient, oftentimes a Medicare recipient, would respond in the affirmative and the Encore caller would then follow up with the patient's physician with a recommendation of an adjacent episode of therapy, most commonly the Balanced For Life program.

184.    In addition, Encore provided Amedisys with another way to increase revenue following the PPS changes in 2008. Along with the change in therapy bonus threshold, there was an increase in reimbursement for later episodes of care.

185.    Specifically, CMS developed a 4-equation case-mix model that recognizes and differentiates payment for episodes of care based on whether a patient is in what is considered to be an early (1st or 2nd episode in a sequence of adjacent covered episodes) episode of care. Early episodes include not only the initial episode in a sequence of adjacent covered episodes, but also the next adjacent covered episode, if any, that followed the initial episode. Later episodes are defined as all adjacent episodes beyond the second episode. "Adjacent episodes" were those that occurred within 60 days of each other and were reimbursed at a higher rate.

186.    So, even if a patient was discharged, if Encore called them and found out that they had, perhaps, fallen again since discharge, they could be readmitted again within 60 days from the last episode and get even more money because it was considered an adjacent episode.

46

187.     Interestingly, CMS has raised serious concerns over conflicts of interest in patient satisfaction surveys conducted by HHAs themselves and new rules, effective in late 2009, prohibit "self-reported" surveys and require them to be performed by an independent third party.

188.     In fact, although not positioned as a patient satisfaction survey program, Amedisys was seemingly concerned enough about the practices of Encore that a decision was made to outsource services and move all data to Cincom, a Cincinnati, Ohio company.

## E.     Amedisys' Failure to Safeguard Protected Health Information

189.     Pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub.L. 104-191, 110 Stat. l936., Amedisys is a "healthcare provider" within the meaning of the statute vested with the duty to safeguard protected health information ("PHI").

190.     To preserve the confidentiality of that PHI, HIPAA imposes restrictions upon how such information is obtained, accessed and used by healthcare providers and their business associates.

191.     Amedisys houses all its confidential patient data in AMS2.

192.     Outcome Concept Systems ("OCS") partners with Amedisys and provides comparative data analysis to Amedisys on an as needed basis.  Specifically, OCS is the self-anointed "market leader" in healthcare information solutions. OCS collects, evaluates and interprets healthcare information, for the purpose of tracking good (and bad) outcomes in home health care. The company provides benchmarking and business intelligence software to home health care agencies, hospices, and other service providers involved in the home health care industry.

193.     Amedisys is OCS' largest customer by a wide margin.

47

194.     Because OCS' data analysis requires a review of Amedisys patient records, those records, including sensitive patient information, are electronically transmitted from AMS2 to OCS on a regular basis.

195.     In or around August 9, 2008, OCS mistakenly sent Amedisys agency reports containing PHI of 4,084 Amedisys patients (including patient names, start of care and discharge dates) to 7 home health care entities outside of Amedisys in direct violation of HIPAA regulations.

196.     Although OCS and Amedisys were obligated to report these HIPAA violations to the government, Amedisys' Chief Information Officer Alice Ann Schwartz, after consulting with Chief Compliance Officer Jeffrey Jeter, made the decision to not report the security breach and instead just "let it die" and to "move on."  Ms. Schwartz's stated reason for overlooking OCS' serious breach of HIPAA was because at that time, OCS was working on "major projects" for Amedisys and she did not want this issue obstructing the progress of those projects.

197.     The August 9, 2008 HIPAA breach was not the first time Amedisys identified serious concerns with OCS' handling of PHI.  According to email correspondence dated August 19, 2008 from Amedisys Enterprise IT Security Manager Mike Wilson to OCS Executive Leadership, by August 2008, Amedisys already had identified serious issues with OCS and its ability to safeguard PHI:

OCS Executive Leadership,

Naturally, the exposure of any portion of the PHI with which Amedisys has entrusted OCS is of great concern to us, both from a regulatory perspective and for those consequences with which we must now accept and from a business partner perspective in moving forward.  The OCS - Amedisys business relationship has been subject to much scrutiny from the perspective of IT Security since the time I have been made aware of your business model which both requires us to transmit a great deal of our patient PHI and hosts such data on a Web application, potentially exposed to anyone with Internet access.

> Specifically, IT Security has great concerns with the strength of your
> authentication model, whether accounts will be enabled and disabled in a timely
> fashion to prevent unauthorized access, and the presence of best practices
> protection mechanisms such as account lockout when too many login failures
> occur. These concerns existed with the application as previously proposed and
> described by OCS.
>
> Now it appears there are programmatic issues with OCS which the incident on
> Sunday, August 10th have brought to light. I now have additional concerns with
> OCS's application of change management and control, testing and quality
> assurance, and the overall rigidity of your System Development Life Cycle.
>
> The reality is that we have had a breach of our PHI, which may well be
> reportable, and a business associate with which we have to be assured, as per the
> HIPAA Security Rule (§164.314(a)(1), does not exhibit "a pattern of an activity
> or practice of the business associate that constituted a material breach or violation
> of the business associate's obligation under the contract." That obligation, in this
> case, obviously being the "adequate protection of PHI."
>
>          \*      \*      \*

198.    In lieu of remedying these legitimate concerns prior to OCS' egregious August

2008 disclosure of PHI, Amedisys allowed the security issues to continue unabated apparently to

serve its business interests and to preserve the relationship with OCS.

## F.    Amedisys Conspires with E&Y In Connection with the "Case Mix Project" and E&Y Audit

199.    Amedisys processes all patient information, case mix data and billing functions in

proprietary software known as AMS2. Accordingly, the broad scope of the 2008 refinement to

HH PPS required the company to overhaul the AMS2 software system to bring it in line with the

2008 reimbursement changes.

200.    During a staff meeting in September 2007, the Amedisys Chief Information

Officer ("CIO") Alice Ann Schwartz tasked the Vice President of Information Services, Dana

Voss, to develop a Case Mix Project Plan to map out a plan to implement the necessary

programming changes to AMS2.

49

201.    During the same meeting, CIO Schwartz directed the IT Compliance Manager to engage outside consultants to perform a certification and review of the data collected through the Case Mix Project created by Voss and advising that the third party validation was necessary to appease Amedisys' Board of Directors. CIO Schwartz suggested that E&Y be considered for the certification project based on Amedisys' relationship with E&Y from previous projects.

202.    As instructed by CIO Schwartz, Voss created the "Case Mix Project Plan version 1.0," dated October, 2007 and named Schwartz as the project's sponsor. The stated purpose of the Project was to "address the Prospective Payment System and Case Mix changes occurring in 2008." As such, the Case Mix Project Plan "identifies AMS code changes that must be made in order to comply with the new 2008 refinements to PPS calculations and case mix."

203.    The successful implementation of the case mix project was of critical importance to Amedisys, because AMS2 is Amedisys's command center that performs not only all of Amedisys' billing functions, but also generates patient case mix data that forms the basis for Amedisys' reimbursement claims for home health patients.

204.    Arguably, as evidenced by its detailed inclusion in the Case Mix Project Plan, of paramount concern to CIO Schwartz was that the practical result of EY finding improper or insufficient documentation resulting from the case mix data project would be to force Amedisys to have to restate revenue, a potentially devastating event. In fact, the Case Mix Project Plan contemplates 35 potential revenue restatement risks that could result if there were errors in the implementation of the Case Mix Project Plan and resulting coding changes to AMS2.

205.    Previously, in 2001, Amedisys had to restate revenue resulting in an almost 60% drop in its stock price and class action lawsuits alleging securities law violations. Specifically, according to news reports, on March 1, 2001, Amedisys issued a press release touting positive

financial results in connection with its home health nursing services. The statement announced, among other things, that the company had reduced its net loss form continuing operations by more than 70% for the year ended December 31, 2000. However, on June 13, 2001, Amedisys issued a press release announcing a restatement of its previously claimed earnings. The company revealed a negative adjustment to net service revenue of between $4 million and $7 million meaning Amedisys was actually unprofitable, even though it had previously reported strong earnings.

206.    It is particularly significant that Amedisys's revenue restatement was apparently the result of it failure to successfully implement changes to its billing system to bring it in line with the inception of the HH PPS in January 2000. Amedisys was facing a similar situation for January 2008. The following is excerpted from a July 17, 2001 Amedisys press release:

> The implementation of the Medicare Prospective Payment System PPS on October 1, 2000 made significant changes to the reimbursement methodology for home health nursing companies necessitating changes to systems which process provider and patient-specific claims for both the Medicare intermediary and the individual home health provider. The company noted certain discrepancies in these systems which had the effect of overstating net service revenues in the fourth quarter of 2000 and the first quarter of 2001. The Company and it [sic] disclosed these discrepancies to the investment community in a news release dated June 13, 2001 and a conference call held on June 14, 2001.
>
> The Company, with the assistance of the Company's external auditing firm, has completed a review of all Medicare patients served and has quantified the impact of the net service revenue overstatement upon its previously reported operating results.

207.    Once the coding changes to AMS2 were implemented pursuant to the Case Mix Project, Amedisys' Quality Assurance Department ("QA") conducted its own case mix update testing project which, ultimately, was to be validated by a third party, E&Y.

51

208.    On or about October 12, 2007, Amedisys and E&Y executed a retainer letter designating the engagement of E&Y's Health Sciences Advisory Services. The scope of E&Y's engagement included, but was not limited to:

Analyze the Company's Medicare case mix testing project and document findings

- Select sample by phase (six phases tested by Quality Assurance department) and analyze case mix testing documentation provided by the following Business Units: Episode management, Revenue Recovery (Claims Integrity & Billing), and Accounting.

209.    Based on internal documentation, prior to the E&Y on site work, Amedisys' QA Department ran some sort of case mix testing project on a sample consisting of 1,429 episodes taken from two datasets: 187,062 Medicare Episodes beginning in FY 2008 and 71,290 Medicare episodes beginning in FY 2007 and ending in FY 2008 (otherwise known as straddlers). Importantly, E&Y was engaged, at least in part, to "analyze" and "document findings" from the QA claims review.

210.    Interestingly, E&Y's draft report dated February 14, 2008, points out that Amedisys QA should have tested 137 more episodes (1,659) in order to attain a 99% confidence level with a 2% sampling error and 5% expected error rate.

211.    Indeed, E&Y reported in the same aforementioned draft findings letter, that "QA determined they would utilize a testing parameter of 99% confidence level. This confidence level has not been attained." Such a statement is revealing in that Amedisys failed to meet its own criteria for an internal review.

212.    At Amedisys' direction, E&Y selected a statistically valid sample, 283 episodes out of the 1,429 ostensibly tested by QA, for the purpose of evaluating whether the required documentation and calculations that AMS2 should have generated during the claims processing of the test episodes was in fact produced and was accurate.

52

213.    Much of the AMS2 documentation E&Y was retained to test directly, impacts the validity and accuracy of the ultimate reimbursement claim to Medicare or private insurance. Indeed, as stated above, Amedisys acknowledged in Voss's Case Mix Project Plan that Amedisys could suffer as many as 35 revenue restatement risks if the AMS2 coding changes called for in the Case Mix Project Plan were not properly implemented.

214.    As scheduled, E&Y began work on December 4, 2007 with E&Y auditors Ododo Enabulele and Lloyd Haggard on site at Amedisys. Although not involved in the day to day operations of the engagement, E&Y audit partner Erik Shannon, based in Houston, Texas also played an oversight role in the E&Y engagement.

215.    As part of the E&Y engagement, E&Y's on site auditors prepared weekly status reports at the end of each week of the engagement that described not only the work performed but E&Y's issues and findings during the week.

216.    One such status report, dated December 14, 2007, is particularly revealing in that it reports of material deficiencies and defects in documentation being uncovered by E&Y.

217.    According to the aforementioned status report, during the week of December 14, 2007, Amedisys provided E&Y with 4 datasets of episodes totaling 800 episodes. Out of those 800 episodes, E&Y randomly selected 144 to test on site during that week.

218.    Upon selecting the 144 episodes, E&Y provided the sample list to Dana Voss who then asked key individuals to provide requested documentation for each of those episodes. Pursuant to the terms of the engagement, Amedisys' four business units, identified *supra*, were supposed to provide E&Y documentation ostensibly supporting the billings for the 144 claims.

219.    Under the heading "ISSUES AND FINDINGS", the December 14, 2007 status

update clearly articulates the scope of the deficiencies being discovered in their review of the

sample episodes including:

- Insufficient Episode Management documentation (missing manual calculation worksheets)
- Insufficient Billing and Claims Integrity final claims documentation
- Incomplete accounting documentation for final billed claims (no supporting calculations for the adjustments made to final billed documentation)
- Invalid Scenario category information based on testing
- Non Matching HHRG codes between Episode Management and Accounting Rap information
- No adjustments being made in Scenario categories that should have adjustments
- There is a bug in the Medicare Grouper in Phase V which causes the wrong HIPPS to be selected

220.    Many of these findings are particularly troubling from a revenue restatement

perspective. Specifically, absent remedial measures, each of these deficiencies could directly

affect the validity of Amedisys' reimbursement claims billed through the AMS2 system. For

example, the findings relating to non-matching HHRG codes between departments and the

programming bug that resulted in the wrong HIPPS code being selected tied directly to the

validity of Amedisys' claims submissions to insurers because the HHRG and HIPPS code dictate

the amount of reimbursement paid by Medicare to a HHA.

221.    In addition to the December 14, 2007 report, E&Y's billing sheets indicate that

E&Y also prepared status updates on the following dates: December 7, 2007; December 28,

2007; January 4, 2008; and January 11, 2008.

222.    In January 2008, upon discovering the cost of the project had exceeded $125,000,

CIO Schwartz instructed the IT Compliance Manager to cease all field work by E&Y under the

pretext that the project had "gone over budget." Pursuant to orders by Schwartz, the IT

Compliance Manager instructed E&Y to stop work on January 11, 2008. Notably, on January

16, 2008, the Compliance Manager was forced to resign.

54

223.    Following the abrupt end of their field work, and as contemplated in the engagement, E&Y prepared a letter marked "Draft" and dated February 14, 2008, encapsulating their findings based on the analysis of Amedisys episode documentation for 283 episodes provided from December 7, 2007 through their final visit on January 11, 2008.

224.    The "Draft" letter was addressed to CIO Schwartz; however, EY auditor Ododo Enabulele sent the letter via email to new Amedisys IT Compliance Manager, Dana Dugas, on February 18, 2008.

225.    CIO Schwartz's work stoppage notwithstanding, **E&Y had already completed the initial phase of its field work as of January 11, 2008**. Accordingly, E&Y's draft report was based upon the full scope of work contemplated by Amedisys and E&Y. The work stoppage only put on hold E&Y's follow up field work scheduled for January 21, the purpose of which was "to analyze the progress of changes made to the case mix testing documentation based on preliminary findings provided to the respective business units."

226.    E&Y's draft report articulated several major shortcomings including data and documentation deficiencies, inadequate sample sizing to achieve a 99% confidence level; a potential problem with "overstating the 60 day standard per episode rate leading to a misstatement of patient receivables and month-end contractual allowances," and no master record for claims making documentation impossible to confirm. Due to the overwhelming number of document deficiencies found in the 283 episode sample, E&Y recommended that Amedisys review its entire internally generated sample of 1429 episodes for document deficiencies:

Attachments A, B and C delineate potential documentation deficiencies. We recommend the business units resolve outstanding items found in the Ernst & Young sample. Because of the number of discrepancies, the Company should

consider reviewing the remainder of their internally generated sample for documentation deficiencies as well.

227.    As discussed *supra*, the finding of such an abundance of "potential" documentation deficiencies across the 283 episodes tested gave rise to potentially devastating consequences for Amedisys in terms of revenue restatement risk.

228.    Significantly, the E&Y status reports, the draft letter, and Attachments A, B and C thereto, put Amedisys on notice at the highest executive level - CIO Schwartz - that Amedisys's AMS2 system as reprogrammed for the 2008 changes to the HH PPS was generating serious document deficiencies and that unless the AMS2's issues were remedied, Amedisys would be submitting false and or fraudulent reimbursement claims to Medicare and private insurance, thereby materially overstating the Company's revenues.

229.    Additionally, another key finding in the E&Y draft letter is found under the Section "Required Quality Data." The draft letter provides:

> The Deficit Reduction Act of 2005 required all home health agencies to submit 10 OASIS publicly reported home health quality measures. These measures were to be submitted by home health agencies in order to receive a full increase in their market basket percentage increase amount (2% for FY 2008). **The AMS system is currently set up with the assumption that all quality measures requirements were submitted to CMS.** Documentation was requested from [**redacted**] (IT Compliance) certifying that all 325 agencies submitted the quality data but was never received during the engagement. We could not verify that Amedisys will qualify to receive the full increase in their market basket percentage increase.

(emphasis added)

230.    Under the "Recommendations" section of the report, E&Y emphasized the serious financial impact to Amedisys's revenues if the AMS2 continued to assume that Amedisys was entitled to the 2% market basket increase without verification for all 325 agencies that the required quality measures documentation had been submitted to CMS:

56

Required Quality Data: It is important to know if all agencies have submitted the required quality data. The penalty for not submitting the data is a 2% decrease in the 60-day standard per episode rate. **If certain facilities did not submit the quality data, the 60-day standard per episode rate in AMS (Company software) for those facilities is overstated by 2%. The overstated rate may result in a misstatement of patient receivables and month-end contractual allowances.** We recommend a tracking process is implemented [sic] to identify the agencies' compliance with the quality data submission requirement. The list of non-compliant agencies should be shared with the Department responsible for updating the Medicare rates **to ensure AMS reflects the accurate rates responsible for updating the reimbursed by Medicare**.

(emphasis added).

231.   According to Relator, Amedisys either did not or was unable to produce the required quality measurement requirements for any of its agencies during E&Y's 6 weeks of field work.  Based on Amedisys' inability to produce this crucial verification information to E&Y, Relator believes that Amedisys may not have complied with CMS requirements to be entitled to the 2% market basket increase.

232.   As corroboration of this assertion, when E&Y ultimately returned to Amedisys to "complete" the case mix testing project, discussed *infra*, Amedisys omitted from the scope of E&Y's follow up work the validation that required quality data had been submitted to CMS to qualify for a 2% basket increase.  Roughly three months passed between the time E&Y completed the initial field work and the start of E&Y's follow up work.  Three months is more than a sufficient amount of time for Amedisys to gather the required quality assurance verifications from its agencies.

233.   To the extent Amedisys failed to qualify for the 2% basket increase, at a minimum, the E&Y draft report put CIO Schwartz on notice that Amedisys was overbilling Medicare.  Indeed, Amedisys' net service revenues for 2008 totaled $1.2 billion.  A 2%

overstatement could amount to $10,000,000 to $20,000,0000 assuming each of Amedisys's home health agencies were noncompliant.

234.    E&Y's draft letter also identifies that in E&Y's testing of the Medicare Expected Payment calculation, a very small number of claims, only two per category of 60-day episode, partial episode, low utilization payment and outlier payments, were selected "as directed by Amedisys Management." In fact, it is believed Amedisys' Episode Management department (headed by Tasha Mears) handpicked those 8 claims because they would yield a positive result. Accordingly, Relator avers that E&Y's finding that "all 8 claims tested in AMS agreed to Ernst & Young's re-calculation of the expected payment" was bogus and contrived.

### 1.    E&Y Changed the Report Findings at the Direction of Amedisys

235.    Upon information and belief, after reviewing the draft findings letter, CIO Schwartz personally, or through her subordinates, threatened to withhold payment of E&Y's final invoice for $113,000[5] and/or never work with E&Y again if auditors did not change the audit findings represented in its report to effectively water down E&Y's conclusions.

236.    Subsequently, CIO Schwartz, through her mouthpiece, new IT Compliance Manager Dana Dugas[6], directed senior IT management to "make the E&Y situation go away" because E&Y had "not been cooperative," was "unprofessional" and had "created havoc."

237.    Over the course of the next several weeks, there was a flurry of email correspondence between CIO Schwartz, Dana Dugas and E&Y, culminating in E&Y's agreement to water down its draft findings.

238.    In an email dated March 7, 2008 from Dugas to Enabulele, Dugas writes, "Ododo, Alice Ann has reviewed the draft report. I wasn't sure if you guys were waiting on her to issue

---

[5] The total cost of the project was $128,000, however Amedisys paid an upfront retainer of $15,000.

[6] Dana Dugas has since gotten married and is now Dana Tarver.

the "Final" report? Also, can you please give me a status on the detailed bill." Enabulele

responded by forwarding a detailed bill, writing, "Dana, Attached is the bill detail you

requested…Please let me know if you have any further questions. With regards to the issuance of

the Final report, we are waiting on feedback or comments per Alice Ann's review. If there are no

comments or concerns, please let me know and we will go ahead and issue the final report next

week. Thanks."

239.    In an email dated March 10, 2008 from Dugas to CIO Schwartz, Dugas writes:

> Alice Ann, Please see an attached copy of the detail hours from Ernst &
> Young related to the Case Mix audit they performed. They would like to
> know if you have any "feedback or comments" related to the report before
> they issue a Final copy.

240.    A week later, in an email dated March 17, 2008, Dugas writes to CIO Schwartz:

> AA, I just wanted to follow up with you regarding the Ernst & Young
> Case Mix Engagement. I spoke with Ododo Enabulele this morning and
> talked him through what we would like for them to come back and do for
> free. The impression I got from him was that he agreed more work was
> needed to reach a "final" conclusion. His initial thought was that they
> would be able to do the work for free but wasn't sure about covering the
> expenses. He has to follow up with his manager and partner and get it
> approved, as he doesn't have the authority to make the final decision. I
> feel confident based on our conversation that we should probably be able
> to work something out.

241.    On March 19, 2008, Dugas forwarded an email from Enabulele indicating that

E&Y audit partner, Erik Shannon, was on vacation and that no decision could be made until he

returned.

242.    On or about April 2, 2008, IT Compliance Manager Dugas emailed E&Y's

Enabulele for the purpose of providing a meeting agenda and Amedisys expectations for follow

up work to be performed on the case mix testing.[7]

---

[7] As stated above, this follow up work originally was scheduled to commence on January 21; however, it
was postponed when CIO Schwartz issued directed that E&Y cease all field work.

243. According to internal documents, on April 3, 2008, a meeting was held at Amedisys' headquarters in Baton Rouge, Louisiana, with E&Y agreeing to fly in "at their own expense to discuss [Amedisys's] expectations…". A fact that, in and of itself, suggests the influence Amedisys wielded over E&Y.

244. The meeting included Ododo Enabulele as well as CIO Schwartz and, according to the agenda circulated by Dugas, the following was listed as an "Expectation for Ernst & Young":

> 1. Complete [E&Y's] review of the Case Mix Pre-Testing.
>     a.    where exceptions and recommendations were notified for user acceptance testing, follow up to determine if all were remediated.
> 2. Perform a summary review testing of Case Mix Post Implementation.
>     a. Review all areas' Test Plans and Sample Methodologies for appropriateness.
>     b. Evaluate our testing methodology:
>         • Review 1 patient's testing documentation for appropriateness.
>         • Review checklists and screenshot evidence for appropriateness
>     c. Review the Conclusions reached from each area.
>     d. Advise on how we might be audited on this in the future (by external auditors).

245. Although it is unclear what work E&Y actually performed to "Complete [E&Y's] review of the Case Mix Pre-Testing", it is striking that Amedisys directed E&Y to evaluate the appropriateness of Amedisys' Case Mix Post Implementation testing *by reviewing just one patient's testing documentation*. It is believed that this single patient file was handpicked by Amedisys to ensure a favorable finding by Amedisys.[8]

246. Another way Amedisys' seemingly manipulated the scope of E&Y's follow up work to contrive a positive result in the final report (and in turn to make all of the AMS2 document deficiencies identified with specificity in E&Ys draft letter "go away"), is established

---

[8] Notably, E&Y's testing of Post-Implementation Case Mix testing was an add-on from the original engagement.

by the language of the "Deliverables" section of the Amedisys Meeting Agenda and Expectations. There, Amedisys directs E&Y to "[p]rovide a final report listing only the results that you reached a final and complete conclusion on."

247.   By limiting the scope of E&Y's follow up work – for example, directing E&Y to review just one patient's testing documentation – Amedisys virtually ensures that the "final report" would be cleansed of all of the negative findings that required follow up as identified in the draft letter dated February 14, 2008. Indeed, the draft report identified potential document deficiencies noted during the 6 weeks of field work. Since the Amedisys-defined narrow scope of the follow up work prevented E&Y from exploring further these deficiencies, the final report would not contain reference to these material findings.

248.   Further evidencing the unlawful agreement between E&Y and Amedisys to whitewash the Case Mix Testing Report, is a telephone conversation that took place between a former Amedisys employee and E&Y on site auditor Ododo Enabulele. During the course of that call, the former employee inquired about the content of E&Y's final report, to which Enabulele admitted that, due to pressure applied by Amedisys, E&Y altered its certified conclusion and findings, described *supra*, in order to reach a favorable result for Amedisys. In furtherance of that unlawful agreement, E&Y returned to Amedisys to conduct a "follow up" review ostensibly to create a basis for its findings.

249.   In October 2008, senior executives at Amedisys delivered a three-ring binder entitled "Internal Compliance Review" to its Board of Directors, which described Amedisys's Internal Audit's ("IA") "Overall Audit Conclusion" of the Case mix Project as "Satisfactory." Based on E&Y's findings recorded in the draft report that seem to contradict IA's purported

61

satisfactory audit conclusion, CAF Partners contend that Amedisys' report to the Board of Directors was false and misleading.

250. On information and belief, at the time of this presentation, Amedisys executives at the highest level had knowledge of the findings in E&Y's draft letter that the implementation of the Case Mix Project was flawed and left open the possibility of financial restatement risks. Instead, Amedisys chose to tell the Board half of the story, by reporting on the results of an audit conducted internally, and to omit purposefully the material information revealed by E&Y's consulting services.

251. Upon examination of the 2008 slide presentation to the Board of Directors, the slide discussing the internal audit defines the scope of the work to include: "Test[ing] the accuracy of HIPPS codes calculations for OASIS data to ensure that they appropriately reflect the 2008 Case Mix Changes"; "...verify that AMS2 is calculating the expected revenue and billing the correct amount for each claim," and "review the payments received to ensure that the actual reimbursement reflects that expected reimbursement in AMS2."

252. Remarkably, E&Y's December 14, 2007 status report described in detail *supra*, specifically calls into question non-matching HHRG codes (which forms the basis for HIPPS codes) and incomplete and insufficient documentation for final billed claims and Accounting RAP information.

253. Despite the problems uncovered by E&Y, Amedisys appeared to tout its compliance and misrepresent its billing risks. Specifically, on December 17, 2008, Amedisys posted on its website a report or article titled "IT Division Profile." The article devotes an entire section to a discussion of the 2008 Case Mix Refinement project, wherein Amedisys represents that "[t]hree separate entities performed testing of this change," including a "third party review"

by an "external consultant." Amedisys goes on to report that "External Consultants" performed a "third party validation" and "documentation recommendations were implemented by the respective business owners."

254. Amedisys also reports that "Internal Audit performed an assurance review, testing patient data as it flowed through the system. They noted no exceptions." Relator contends that Amedisys' characterization of the findings of the work performed by E&Y and IA were intentionally misleading as such claims could not be made when Amedisys CIO Schwartz had knowledge of the pervasive potential document deficiencies identified by E&Y in its draft findings. Indeed, E&Y's draft letter appears inconsistent with IA's purported finding that there were "no exceptions" noted when patient data was tested as it flowed through AMS2.

### 2. Amedisys Engaged E&Y for a SOX Audit as Inducement for Altering Findings from the Case Mix Certification

255. As discussed *supra*, upon information and belief, an agreement was reached between Amedisys and E&Y to revise the critical draft report and water down its findings. Subsequently, a letter engaging E&Y to do additional work for the company was executed.

256. On April 1, 2008, in an email from Kevin Taylor at E&Y to Collin McQuiddy, Vice President of Accounting at Amedisys, subject matter "RE: 2008 engagement letter," Taylor attached a letter dated April 1, 2008 addressed to Chief Financial Officer Dale Redman confirming the engagement of E&Y to "provide project assistance" to Amedisys related to the "pending requirements of Section 404 of the Sarbanes-Oxley Act of 2002."

257. In Exhibit A of the April 1, 2008 engagement letter under Scope of Services, E&Y notes, "The objective of our engagement is to assist management of the Company in the testing and evaluation of information technology ("IT") general controls and application controls (collectively, "IT controls") over financial reporting for the Company's significant accounts and

processes, as identified by the Company, and to report any findings and recommendations for improvements in the design and operation of those controls we may identify as a result of this assistance. **The documentation prepared as a result of this project will relate only to the specifically identified controls and will not address all types of errors or fraud that may occur.** " (Emphasis added)

258.    It should be noted that this is entirely consistent with Amedisys' standard operating procedure with regard to audits, both internal and external, whereby the objective is to test processes and controls but not the accuracy of the data itself.

### G.    Amedisys' Kickback Schemes

#### 1.    *"Physician Consultants" and "Medical Directors"*

259.    Amedisys improperly induces patient referrals by hiring physicians as "Physician Consultants" or "Medical Directors" for unspecified services or services not rendered.

260.    In addition, the company has routinely provided lavish trips for its physician consultants who refer home health patients, including one to the "breathtaking" Ritz-Carlton Grande Lakes in Orlando, Florida in June 2004.   The meetings include presentations by numerous members of the Amedisys inner circle including Alice Ann Schwartz, Ann Frechette, Jim Young. and Tasha Mears.   An article for the company newsletter noted, "Physician consultants learned valuable ways to enhance their practices in addition to getting the most out of referring patients to Amedisys for home health care."

261.    Notably, spouses and children of the physician attendees are invited to attend these exotic and luxurious annual physician consultant "meetings," at Amedisys' expense.    In addition to the free vacation, Amedisys sweetens the deal and further entices referrals by including rounds of golf, dinners and spa appointments for the consultants and their families.

64

262.    Not only does Amedisys attract referrals from physicians with exotic getaways, the company also espouses the idea that doctors can be bought off. For example, at the 2008 leadership conference in Orlando, Florida, a skit called "Late Night with Amedisys" presented doctors acting like zoo animals that could be trained by "a good counselor salesperson". In the skit, the trainer tempts the shy, reluctant physician with promises of golf outings as an inducement to bring the doctor into the Amedisys fold.

### 2.    *Nurse Liaisons/Account Managers*

263.    Traditionally, almost all HHAs have one or two people who perform "intake" of new patients, a process usually done by either telephone or fax between the hospital administration and the agency. Hospitals usually give out the referrals to HHAs by utilizing their own staff of discharge planners and case managers. The primary function of these positions is, once the physician has made a referral for home health care, they are to speak with the patient, talk to family members, and finalize plans for discharge.

264.    Upon information and belief, to induce hospital referrals, Amedisys provides hospitals with home care "Nurse Liaisons" also known as "Account Managers" to ease the workload of hospital discharge planners by meeting with the patient prior to discharge and helping with the discharge process. Unlike Account Executives who focus on marketing to physicians, Amedisys requires Account Managers to be registered nurses to facilitate assisting in the hospital setting.

265.    In a marketing brochure entitled "Amedisys Home Health: bridging the gap," the company describes the lengths to which the Account Manager will go to service the patient while still in the hospital, prior to discharge:

"Amedisys Account Manager Will Conduct an Onsite Visit:

65

- Meet with Care Manager/Discharge Planner/Medical Personnel
- Meet patient/family/caregivers
- Review chart and work up referral
- Address any additional needs identified
- Order DME/Infusion

266. Account Managers frequently have offices in the hospital and maintain close relationships with discharge planners so that when a patient is ready to be discharged to home care, the Amedisys' Nurse Liaison is at the patient's bedside to do intake with a moment's notice.

267. Like so many positions within Amedisys, despite the fact that AMs are not supposed to solicit business, they are incentivized to meet corporate referral quotas in order to qualify for commissions and sales awards described *infra*.

### 3. *Amedisys Provides Sales Managers and Sales Personnel with Lucrative Cash Bonuses Based Solely on Generating Medicare Business*

268. All along the patient referral and admission process, Amedisys' employees are incentivized to meet corporate revenue goals. For example, account executives are bonused for Medicare patient referrals but *not* for referrals of non-Medicare patients.

269. In addition, Account Executives ("AEs"), Account Managers, Directors of Operations ("DOOs"), and Directors of Business Development who achieve at least 120% of their budgeted referral goals for one quarter become members of the President's Circle and are paid bonuses of $1000, $3000 or $5000 depending upon how much they exceeded goals. Those who maintain a referral level of at least 120% for an entire year enter into the coveted Chairman's Club and receive an extra $3000 on top of their quarterly bonuses. In the 3rd Quarter of 2009 alone, 126 employees gained President's Circle recognition.

270. Both President's Circle and Chairman's Club members are rewarded with a lavish 4-day trip to a resort location complete with an awards dinner. Managers of these account

executives are also invited on the trip and become eligible for the annual Leadership Conference event held at resort locations such as Orlando, Florida and Montego Bay, Jamaica.

271. Just as with the Physician Consultant retreats, Amedisys paid not only for the President's Circle and Chairman's Club recipients to attend, it also paid for the spouses of those employees. In addition, at one such retreat held in 2008 at the Ritz Carlton in Montego Bay, Jamaica, upon check in, attendees received $500 vouchers for use at the resort and spouses received an additional certificate in the amount of $250 to be used for "recreational activities" including the spa and golf.

272. Directors of Operations at individual agencies are also eligible for financial bonuses if they achieve so-called "NIFO" (net income from operations) goals and can be docked pay if they fail to meet goals according to a complex and dubious program of incentives and sanctions, known throughout Amedisys as "Care Math."

273. These munificent performance-based rewards for employees in key positions in the field, and their families, appear to be designed to entice employees to meet and exceed their financial and Medicare admit goals by whatever means necessary.

### 4. *"Mercury Doc"*

274. In 2005, Amedisys launched an early paper-based version of the program now known as Mercury Doc in an effort to increase patient referrals by physicians. The program alerted physicians to the revenue enhancement opportunities available by billing CMS for Care Plan Oversight ("CPO") reimbursement every time that they certified or re-certified a patient. This early iteration provided physicians with a simple form, the "Care Plan Oversight Minute Log" to enable tracking and CPO billing.

275.     To even further enhance referrals, in 2007, Amedisys rolled out Mercury Doc v2.0, a free "proprietary" web-based software program, for the first time, automated physician time tracking and invoice processing making CPO a virtually effortless and profitable endeavor for physicians. With the introduction of this new web-based program, account executives were able to successfully market Mercury Doc to physicians as a way to earn "extra income," depending upon the number of patients referred to Amedisys.

276.     Mercury Doc is a thinly veiled kickback scheme in which the incentive is unwittingly paid by CMS. According to the Vice President of the National Association of Home Care ("NAHC"), it was judged a kickback after a complaint from a competitor of Amedisys' prompted a review by NAHC's General Counsel.

277.     Amedisys' account executives entice physicians to refer patients by explaining that they are leaving "$25,000 to $45,000" a year in Care Plan Oversight ("CPO") Medicare reimbursement "on the table." However, with Mercury Doc, the account executives suggest, the doctors can reap those additional Medicare CPO billings without performing any additional services.

278.     Account executives are trained to explain to physicians that when they (or anyone who has their login and password) opens Mercury Doc on their computer, they will be able to see all their Amedisys' patients' files. In fact, as soon as the files are opened, an internal timer in Mercury Doc will record a continuous log accounting for every minute patient files remain open, then at month's end, Mercury Doc generates an invoice for the time the patient files were opened that month, thereby allowing the physician to bill Medicare for services purported to be CPO.

68

279. CMS regulations allow physicians to bill for CPO services for time spent in oversight of complex cases often involving consultation with specialists. The minimum reimbursable unit of CPO services is 30-minutes.

280. At the Physician Consultant conference held in 2008 at the Ritz Carlton in New Orleans, during their presentation on Mercury Doc, Dave Monic and Jim Young actually told the attendees to "have your nurse log in for you." Despite the fact however that CMS Conditions of Coverage do not permit the simple act of opening a computer file to qualify for reimbursement under CPO, statements such as this, coupled with the marketing efforts of Amedisys' account executives clearly demonstrate the concerted effort to use Mercury Doc to induce physician referrals by promoting what amounts to fraudulent CPO billing.

281. A former AE from Texas further confirmed that much of the CPO billing was done by office staff stating "The benefits, the money, is positive. And then there is being able to chart. But the truth is that once a patient goes home and is out of the acute phase of illness where he needed a doctor—well, the Docs [sic] just don't have the time to go checking files on Mercury Doc for a patient that is in home care. A couple might. Most don't. So it winds up be the secretary or the office manager or a nurse that opens the files."

282. The pay-off for the physicians is not only the CPO time, but the more Amedisys' patients a physician has, the more files there are to view, the more minutes there are to log and the higher the potential CPO reimbursement.

283. In April 2008, Chief Operating Officer Larry Graham requested, and received from the IT department, a spreadsheet detailing the unmitigated success of Mercury Doc. The internal spreadsheet lists individual physicians, and their respective account executives, with a "Before" and "After" Mercury Doc referral scorecard showing the increases.

69

284.     Indeed, to facilitate referrals, Mercury Doc contains a link to the online Referral Section of the Amedisys web site, which allows physicians to make an online referral instead of having to phone the agency.

285.     In addition, Mercury Doc allows expedited changes in, and additions to, the plan of care and recertification through its electronic signature feature. In an effort to simplify and thereby encourage the recertification, Account Executives offer physicians Amedisys "CPO/Recert" sticky pads. Conveniently, the sticky pads also include the reminder that "If you are participating in Physician Care Plan Oversight billing, the code for this patient recertification is G0179."

286.     Mercury Doc was and is in a constant state of development and revision, as evidenced by Amedisys' "Mercury Doc Enhancement Request Tracking Log." For example, Chief Compliance Officer Jeffery Jeter requested the ability to "Add Physician Consultant invoice capabilities." suggesting that the same physicians, who are receiving unearned CPO reimbursement for referring patients via Mercury Doc, may also be receiving additional revenue as physician consultants.  Importantly, in accordance with the rules governing CPO, only the physician who signs the plan of care is permitted to bill for CPO services.

## DAMAGES CAUSED TO THE MEDICARE PROGRAM

### A.     Damages Caused by Manipulating Case Mix Data and Inflating Therapy Visits

287.     One means of calculating the fraud is to take Amedisys' reported average revenue per episode, incorporating both case mix and high-therapy bonus payment, and measure the change above the base Medicare reimbursement rate. Table A, below, shows the period from 2004 to 2009.  The fourth row from the top, "Delta represented by mix/coding" shows the difference in dollars per episode.  That number multiplied by the total number of reported

70

episodes for a given year yields the "EBITDA" (earnings before interest, taxes, depreciation and amortization) or revenue impact of the higher case mix and therapy bonus payments per year.

288.    Table A clearly shows that there is fairly steady revenue enhancement through 2007 when the high therapy threshold was at 10. However, in 2008 and continuing into 2009, with the impact of the new tiered high-therapy thresholds of 6 – 14 - 20 and the new "therapies" like Balanced For Life and Wound Care: A Therapy Approach, the revenue enhancement skyrockets from $67m in 2007 to $206m in 2008, $368m in 2009. In other words, Amedisys not only anticipated the 2008 rule changes (which were put into effect to stop home health companies from gaming the system at 10 visits) but also profited mightily from them.

289.    The total revenue enhancement - from upcoding and high-therapy bonuses - from 2004 to 2009 could be calculated as $776,000,000. Assuming some portion of Amedisys' patients – say 20% - were truly "sicker" and justifiably coded higher (even though experts say it is statistically impossible to have a "sicker" population and account executives are trained to "cherrypick" away from truly sick patients) the value of upcoding and high-therapy bonuses would still be $620,000,000 – and counting.

Table A

|  | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | Total |
|---|---|---|---|---|---|---|---|
| Medicare Base Rate | $2,218 | $2,264 | $2,264 | $2,339 | $2,270 | $2,272 | |
| Amedisys Revenue/episode | $2,552 | $2,567 | $2,634 | $2,660 | $2,854 | $3,166 | |
| % growth | | 0.60% | 2.60% | 1.00% | 7.30% | 10.90% | |
| Delta represented by mix/coding | $334 | $303 | $370 | $321 | $584 | $894 | |
| Total | 80,000 | 144,00 | 172,41 | 208,54 | 353,07 | 411,97 | |

71

| episodes | | 0 | 2 | 7 | 6 | 5 | |
|----------|------|------|------|------|--------|--------|--------|
| **EBITDA Impact** | **$27m** | **$44m** | **$64m** | **$67m** | **$206m** | **$368m** | **$776m** |
| Total EBITDA | $38 | $57 | $76 | $97 | $178 | $259 | |
| EPS Impact | $0.91 | $1.29 | $1.77 | $1.57 | $4.66 | $8.11 | |
| Total EPS | $1.13 | $1.42 | $1.75 | $2.34 | $3.23 | $4.91 | |
| % of EPS potentially from mix/coding | 80.30 % | 91.00 % | 100.80 % | 67.10 % | 144.10 % | 165.10 % | |

Source: Amedisys SEC filings

290.     Therefore, an estimate of single damages in the range of $620,000,000 to $776,000,000 is reasonable.

## B.     Damages Caused by Violations of the Anti-Kickback Statute

291.     On one type of kickback alone, Mercury Doc, which was rolled out mid-2005, enhanced in 2007, and has been in place ever since, the company has claimed publicly that it has resulted in 14% more *physician* referrals (i.e. episodes) than the national average.

292.     Damages caused by violations of the AKS can equal the value of all the claims submitted by a provider "tainted" by Amedisys' offering or paying of kickbacks and also by other means of calculation.  One example of a way to calculate the damages caused just by the Mercury Doc kickback during the 2007 through 2009 timeframe is as follows: calculate the number of episodes for six months in 2007, and all of 2008 and 2009 and multiply that total by the average revenue per episode for each respective year.     This yields a total of $2,589,357,934.00.  Calculating 14% of that total (the percentage of physician referrals above the national average resulting form Mercury Doc) results in additional revenue to Amedisys (i.e. damages to Medicare) of $362,510,110.76.  This is illustrated in the following table:

72

Table B

| | | Average Revenue Per | | |
|------|---------------|---------|----|----|
| **Mercury Doc** | | | | |
| Year | # of Episodes | Episode | Total | |
| 2007 | 104273[9] | \$2,660.00 | \$277,366,180.00 | |
| 2008 | 353076 | \$2,854.00 | \$1,007,678,904.00 | |
| 2009 | 411975 | \$3,166.00 | \$1,304,312,850.00 | |
| | | | | |
| | | | \$2,589,357,934.00 | |
| | | | **\$362,510,110.76** | 14% of total |

## CLAIMS FOR RELIEF

### COUNT I
### Defendants' Violations of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(A) Presenting or Causing to be Presented False or Fraudulent Claims[10]

293.    Plaintiff and the United States reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

294.    This is a claim brought by Plaintiff and the United States to recover treble damages, civil penalties and the cost of this action, under the Federal False Claims Act, 31 U.S.C. § 3730 for Defendants' violations of 31 U.S.C. § 3729 *et seq.*

295.    The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A) provides:

"Liability for certain acts. Any person who--

---

[9] One-half of 2007 episodes since the program was rolled out in 2007.

[10] For all unlawful conduct for which Amedisys and Ernst and Young are liable under this Count that occurred on or before May 20, 2009, the date on which Congress amended and renumbered the Federal False Claims Act pursuant to the Fraud Enforcement and Recovery Act ("FERA"), Pub.L.No. 111-21, §4, 123 Stat. 1617, 1621 (2009), this Third Amended Complaint should be deemed to include violations of the FCA prior to the FERA amendments, specifically, 31 U.S.C. §3729(a)(1).

(A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval …."

*Id.*

296.     By virtue of the above-described acts, among others, since at least 2003, Defendant Amedisys knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval, and continues to present or cause to be presented false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

297.     By virtue of the above-described acts, among others, since at least 2007, Defendant E&Y knowingly caused to be presented false or fraudulent claims for payment or approval, and continues to cause to be presented, false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

298.     In addition, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(B), prohibits the offering, paying, soliciting, or receiving of any remuneration (including kickbacks, bribes or rebates) directly or indirectly, overtly or covertly, in cash or in kind in return for the furnishing of any medical care or services for which payment may be made in whole or in part under any federal health care program.  Compliance with the Anti-Kickback Statute is an express condition of eligibility and payment of a claims submission for reimbursement under the Medicare program.

299.     In other words, when a claim presented to Medicare arises from conduct which violates the Anti-Kickback Statute that claim is ineligible for reimbursement as a matter of law, and upon submission, is thus a false or fraudulent claim in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

74

300. By engaging in the fraudulent and illegal practices described herein, including but not limited to the schemes intended to induce patient referrals involving Mercury Docs, paying physicians as Physician Consultants and Medical Directors when in fact no services or unspecified services were rendered and paid for at more than fair market value, providing hospitals with free services via Nurse Liaisons or Account Managers and in kind payments to doctors in the form of lavish trips, among other things, Amedisys violated the Anti-Kickback Statute.

301. Amedisys' material violations of the Anti-Kickback Statute lead to the presentation to Medicare of claims for patients unlawfully referred by physicians who were offered and accepted Amedisys' kickbacks. Every claim submitted to the United States for services rendered to a patient unlawfully referred to Amedisys was false or fraudulent, as they were ineligible for reimbursement, and therefore by submitting or causing these false claims to be submitted, Amedisys further violated 31 U.S.C. §3729(a)(1)(A) from at least 2003 to the present.

302. Further, Amedisys caused the submission of false or fraudulent claims to Medicare by physicians who accepted the Mercury Doc kickback from Amedisys and in turn submitted claims for CPO to Medicare. Those claims were false or fraudulent because either the physicians had not provided the services being billed and/or because the claims arose from the exchange of an unlawful kickback.

303. Plaintiff United States, unaware of the falsity of the claims that Amedisys submitted, as well as the claims Defendants caused doctors and other health care providers to make to the United States, and in reliance on the accuracy thereof, paid Amedisys, doctors and other health care providers for claims that would otherwise not have been allowed.

75

304. For those claims that Defendants submitted or caused to be submitted, it was foreseeable and in fact the intended result that those claims would be submitted. Further, at all times relevant to the Third Amended Complaint, Defendants acted with the requisite scienter.

305. Plaintiff United States, being unaware of the falsity of the claims and/or statements caused to be made by Defendants, and in reliance on the accuracy thereof paid and continues to pay for Defendant Amedisys' false claims for home health care as well as the false claims of physicians and other health care providers.

306. It is believed that as a result of Defendants' violations of 31 U.S.C. § 3729 (a)(1)(A), the United States has suffered substantial losses in an amount that exceeds the tens of millions of dollars, and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by Defendants.

## COUNT II

### Defendants' Violations of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(B)<br>Creation or Use of False Statements or Records Material to a False or Fraudulent Claim[11]

307. Plaintiff and the United States reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

308. This is a claim brought by Plaintiff and the United States to recover treble damages, civil penalties and the cost of this action under the Federal False Claims Act, 31 U.S.C. § 3730 for Amedisys' violations of 31 U.S.C. §§ 3729 *et seq.*

309. The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B) provides:

---

[11] For all unlawful conduct for which Amedisys and Ernst and Young are liable under this Count that occurred on or before May 20, 2009, the date on which Congress amended and renumbered the Federal False Claims Act pursuant to the Fraud Enforcement and Recovery Act ("FERA"), Pub.L.No. 111-21, §4, 123 Stat. 1617, 1621 (2009), this Third Amended Complaint should be deemed to include violations of the FCA prior to the FERA amendments, specifically, 31 U.S.C. §3729(a)(2).

"Liability for certain acts. Any person who--

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim..."

*Id.*

310. By virtue of the above-described acts, among others, Amedisys knowingly made used or caused to be made or used false records or statements material to false or fraudulent claims paid by the United States, and possibly continues to do so, in violation of 31 U.S.C. § 3729(a)(1)(B).

311. For example, claims for reimbursement would not have been submitted, and thereafter paid by the United States, but for the illegal practices of Amedisys described in this Third Amended Complaint including its false records and statements.

312. By virtue of the above-described acts, among others, E&Y knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims paid by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).

313. For example, claims for reimbursement would not have been submitted, and thereafter paid by the United States, but for the illegal practices of E&Y described in this Third Amended Complaint including its false records and statements, specifically its false and fraudulent certification of the Amedisys case mix audit.

314. In addition, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(B), prohibits the offering, paying, soliciting or receiving of any remuneration (including kickbacks, bribes or rebates) directly or indirectly, overtly or covertly, in cash or in kind in return for the furnishing of any medical care or services for which payment may be made in whole or in part under any federal health care program. Compliance with the Anti-Kickback Statute is a condition precedent for reimbursement under the Medicaid, Medicare and other federal health care

77

programs. The claims Amedisys submitted or caused to be submitted failed to disclose the underlying violation of the Anti-Kickback Statute and/or affirmatively misrepresented that the clams were made in compliance with all applicable laws including the Anti-Kickback Statute.

315. By engaging in the fraudulent and illegal practices described herein, Amedisys violated the Anti-Kickback Statute. Amedisys material violations of the Anti-Kickback Statute lead to the submission of claims for to the United States.

316. Those claims were false or fraudulent, as they were ineligible for reimbursement, and by making or causing to be made false records or statements material to the false claims, Defendant Amedisys further violated 31 U.S.C. § 3729(a)(1)(B) from at least 2003 to the present.

317. The records or statements made or used, or caused to be made or used, by Defendants were material to the false claims submitted to the United States government.

318. Plaintiff United States, unaware of the falsity of the records and/or statements which the Defendants made or used, or caused doctors and other health care providers to make, and in reliance on the accuracy thereof, paid Defendant Amedisys, doctors and other health care providers for claims that would otherwise not have been allowed.

319. For those records and/or statements that Defendants made or used or caused to be made or used, it was foreseeable and in fact the intended result that those statements and/or records would result in the submission and payment of false or fraudulent claims.

320. Further, at all times relevant hereto, Defendants acted with the requisite scienter.

321. As a result of Defendants' violations of 31 U.S.C. § 3729 (a)(1)(B), the United States has suffered substantial losses in an amount that exceeds tens of millions of dollars, and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus

a civil penalty of $5,500 to $11,000 for each such false record and/or statement made or used or

caused to be made or used by Defendants.

## COUNT III
### Defendants' Violations of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(G)

### Making, Using or Causing to be Made or Used, a False Record or Statement Material to an Obligation to pay or Transmit Money or Property to the United States or Concealing, Improperly Avoiding or Decreasing an Obligation to Pay or Transmit Money or Property to the United States[12]

322.    Plaintiff and the United States reallege and incorporate by reference each and

every of the foregoing paragraphs as if fully set forth herein.

323.    This is a claim brought by Plaintiff and the United States to recover treble

damages, civil penalties and the cost of this action under the Federal False Claims Act, 31 U.S.C.

§ 3730, for Defendants' violations of 31 U.S.C. § 3729 *et seq.*

324.    The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G) provides:

"Liability for certain acts. Any person who--

> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government ..."

*Id.* The term "obligation" means:

> "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, form a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment..."

31 U.S.C. § 3729(b)(3).

---

[12] For all unlawful conduct for which Amedisys and Ernst and Young are liable under this Count that occurred on or before May 20, 2009, the date on which Congress amended and renumbered the Federal False Claims Act pursuant to the Fraud Enforcement and Recovery Act ("FERA"), Pub.L.No. 111-21, §4, 123 Stat. 1617, 1621 (2009), this Third Amended Complaint should be deemed to include violations of the FCA prior to the FERA amendments, specifically, 31 U.S.C. §3729(a)(7).

325.    By virtue of the above-described acts, among others, Defendants knowingly made, used, or caused to be made or used false records or statements, and possibly continue to do so, in violation of 31 U.S.C. § 3729(a)(1)(G). Defendants knew from, *inter alia*, the certification of the Amedisys case mix audit and audit conducted by Defendant E&Y for Defendant Amedisys, that Defendant Amedisys had been overpaid by Medicare for years. Yet neither Defendant took the required and appropriate steps to satisfy the obligation owed to the United States, refund or return such overpayments, or to inform Medicare of the overbilling, and instead continued to retain the same, and to overbill the Medicare program.

326.    As a result of Defendants' violations of 31 U.S.C. § 3729 (a)(1)(G), the United States has suffered substantial losses in an amount that exceeds tens of millions of dollars, and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false record and/or statement made or used or caused to be made or used by Defendants.

## COUNT IV
## Defendants' Violations of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(C) Conspiracy[13]

327.    Plaintiff and the United States reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

328.    This is a *qui tam* action brought by Plaintiff and the United States to recover treble damages, civil penalties and the cost of this action under the Federal False Claims Act, 31 U.S.C. §3730 for Defendants' violations of 31 U.S.C. § 3729 *et seq.*

---

[13] For all unlawful conduct for which Amedisys and Ernst and Young are liable under this Count that occurred on or before May 20, 2009, the date on which Congress amended and renumbered the Federal False Claims Act pursuant to the Fraud Enforcement and Recovery Act ("FERA"), Pub.L.No. 111-21, §4, 123 Stat. 1617, 1621 (2009), this Third Amended Complaint should be deemed to include violations of the FCA prior to FERA, specifically, 31 U.S.C. §3729(a)(3).

329. The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C) provides:

"Liability for certain acts. Any person who—

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); …is liable to the United States Government for a civil penalty of not less than $ 5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person, …"

*Id.*

330. In violation of 31 U.S.C. § 3729(a)(1)(C), by the foregoing acts and omissions, Defendant Amedisys and E&Y conspired to violate 31 U.S.C. § 3729(a)(1)(A) and (G).

331. By the foregoing acts and omissions, Amedisys and E&Y agreed and took action in furtherance of their conspiracy, including but not limited to manufacturing the parameters of a sham case-mix audit in 2007 so as to produce favorable audit results and E&Y's preparation of a materially false and misleading audit report called the "Internal Compliance Review." Said actions constitute violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C). Amedisys committed other overt acts set forth above in furtherance of that conspiracy, all in violation of the laws of and causing damage to the United States.

332. Further, Defendant Amedisys conspired with physicians to violate 31 U.S.C. §3729(a)(1)(A) and (B).

333. By the foregoing acts and omissions, Amedisys took actions in furtherance of its conspiracies with physicians, including but not limited to the payment of substantial sums of monies and/or illegal kickbacks to its co-conspirators as well as entering into unlawful contracts. Said actions constitute violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C). Amedisys committed other overt acts set forth above in furtherance of that conspiracy, all in violation of the laws of and causing damage to the United States.

334. As a consequence of Defendants' violations of 31 U.S.C. § 3729 (a)(1)(C), the United States has suffered substantial losses in an amount that exceeds the tens of millions of dollars, and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim Defendants conspired to get paid or allowed.

## PRAYER

WHEREFORE, Plaintiff acting on its own behalf and on behalf of the United States demands and prays that this Court enter judgment against Defendants as follows:

1. In favor of the United States and against Defendants jointly and severally in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729 *et seq.*;

2. In favor of the Plaintiff for the maximum amount allowed as a Relator's share pursuant to 31 U.S.C. § 3730(d);

3. In favor of Plaintiff against Defendants jointly and severally for all reasonable expenses, attorneys' fees and costs incurred by Plaintiff pursuant to 31 U.S.C. § 3730(d); and,

4. In favor of the Plaintiff and the United States against the Defendants for any such other relief as the Court deems just and proper, or that is necessary to make Plaintiff and/or the United States whole.

## TRIAL BY JURY

Plaintiff hereby demands a trial by jury as to all issues.

Respectfully Submitted,

**KENNEY & McCAFFERTY, P.C.**

BY:

Brian P. Kenney PA ID No.: 32944
M. Tavy Deming PA ID No.: 83190
Emily C. Lambert PA ID No.: 205073
1787 Sentry Parkway West
Building 18, Suite 410
Blue Bell, PA 19422
(215) 367-4333
Fax: (215) 367-4335
Email: bkenney@kenneymccafferty.com

Suzanne E. Durrell (BBO #139280)
**DURRELL LAW OFFICE**
180 Williams Avenue
Milton, Massachusetts 02186
(617) 333-9681
Fax: (617) 333-0014
Email: Suzanne.durrell@verizon.net

Robert M. Thomas, Jr. (BBO #645600)
**THOMAS & ASSOCIATES**
280 Summer Street, 5th Floor
Boston, MA 02210-1131
(617) 371-1072
Fax: (888) 676-7420
Email: rmt@thomasandassoc.net

ATTORNEYS FOR PLAINTIFF

Dated: 5|24|12